[No. B140733. Second Dist., Div. Six. Mar. 28, 2001.]

In re the Marriage of ANGELA and LESTER PAUL EGEDI.
ANGELA EGEDI, Appellant, v.
LESTER PAUL EGEDI, Respondent.

COUNSEL

Lascher & Lascher and Denise A. Brogna for Appellant.

Law Offices of Martin S. Friedlander and Martin S. Friedlander for Respondent.

OPINION

**YEGAN, Acting P. J.**—Parties contemplating dissolution of marriage may choose a "friendly divorce" or they can engage in the emotional and financial turmoil of protracted litigation. Some parties electing a "friendly divorce" will seek the help of a single attorney to assist them in putting their settlement agreement in proper legal form.[1] In this situation, there is a problem but not an insurmountable one, i.e., the attorney draftsperson has a potential conflict of interest because he or she cannot simultaneously represent adverse parties. As we shall explain, where a single attorney obtains an informed written waiver of the potential conflict of interest and acts only as a scrivener of the parties' marital settlement agreement (MSA), such agreement is enforceable.

Wife appeals from the judgment challenging the trial court's refusal to enforce the MSA freely and voluntarily entered into by the parties without fraud, duress, or undue influence. The MSA was typed by an attorney who informed the parties of the potential conflict of interest caused by his acting as a scrivener of the agreement. The parties signed a waiver of the conflict. Nevertheless, the trial court invalidated the MSA on the theory that the attorney's disclosures were insufficient to enable the parties to give an informed consent to dual representation. We reverse. We emphasize that the only issue before the court is the enforceability, vel non, of the September 1998 MSA.[2]

---

[1] As pointed out in a leading family law treatise: "Requests for 'dual representation' are common in domestic relations matters. Many couples contemplating marriage dissolution believe they share common interests and/or can amicably come to terms on support obligations, child custody and visitation and a fair property settlement. For convenience—and, especially, to save money—they want to hire a single attorney to draft the necessary documents and obtain and uncontested judgment of dissolution at minimal expense." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2000) ¶ 1:80, p. 1-25.) This situation is to be contrasted to that where the parties to a dissolution seek the assistance of an attorney to mediate their dispute.

[2] At oral argument, counsel for husband claimed that the trial court was motivated, at least in part, by a desire to preclude the filing of malpractice actions. As Judge Hogoboom and

*Facts*

In July 1998, the parties filed a joint petition for summary dissolution of their marriage. Thereafter the parties asked an attorney to formalize their MSA. He had previously represented wife in a criminal matter and husband in a paternity action. He told the parties that he did not want to prepare the MSA because of a potential conflict of interest. He advised them to obtain independent counsel. However, the parties had extreme confidence in the attorney and insisted that he prepare the MSA. He ultimately agreed to serve as the scrivener of their agreement. He told them that he would not render legal advice but would merely set out the terms that the parties had agreed to and add standard provisions normally found in an MSA.

In August 1998, the parties faxed to the attorney their signed agreement, drafted by husband, specifying the terms to be included in the MSA. (See appendix) Husband testified that, during the interval between the fax and the signing of the MSA, the attorney would not discuss the terms with him because of the potential conflict of interest. The attorney "told me that there was a huge potential conflict of interest and that he . . . wanted to remain as neutral as possible . . . ." The attorney testified that he spoke to both parties on the telephone only to confirm the terms they wanted included in the final MSA.

In September 1998, the parties met with the attorney at his office to sign the MSA. The attorney again discussed the potential conflict of interest. The parties signed a waiver which provided: "This will confirm that Angela Egedi and Paul Egedi have been advised that . . . [attorney's] mere typing of an agreement made between the parties may be a potential conflict of interest, despite the fact that he was not in the advisory capacity, nor involved in the negotiation of the agreement. [¶] Each party knowingly waives any potential conflict of interest in the preparation of the parties agreement. In addition, each party has been advised to seek independent legal counsel and advice with respect to this letter and the agreement."

The MSA provided, inter alia, for $750 monthly spousal support to wife until a new lease was signed by the tenant of husband's separate property. After the signing of the new lease, monthly spousal support would increase to $2,000 or one-half of the net monthly lease income, whichever was

---

Justice King have stated, dual representation is ill-advised and a *"dangerous malpractice trap."* (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 1:81, p. 1-25.) We express no opinion on whether the attorney may or may not have committed legal malpractice.

greater. In addition, wife would receive one-half of the "yearly percentage income" paid by the tenant. Spousal support would terminate after five years or when wife became self-supporting, whichever occurred first. The MSA allocated responsibility for the attorney's past due attorney's fees, required husband to pay a $100,000 loan secured by his separate property in Texas, and provided that the parties would keep whatever property was in their possession. The agreement recited that "the parties intend to effect a complete and final division of their assets and debts, and to resolve all rights and obligations relating to spousal support." It also recited: "The parties agree that: (1) each of the parties has read and reviewed this Agreement; (2) each of the parties is fully aware of the contents, legal effect and consequences of this agreement and its provisions; (3) each of the parties has read this Agreement and understands and accepts its contents and acknowledges that there have been no promises or agreements by either party to the other, except as set forth here, that were relied on by either party as inducement to enter into this Agreement; and (4) this Agreement has been entered into voluntarily, free from duress, fraud, undue influence, coercion, or misrepresentation of any kind."[3]

Thereafter wife fully performed her MSA obligations but husband elected not to pay spousal support as agreed. Wife sought judicial enforcement of the MSA. Husband contended that the MSA should be set aside on various ground, i.e., failure of consideration, unfairness, improper conduct by attorney, fraud, duress, undue influence and mistake.

### Trial Court Ruling

The court found that "the MSA was in fact the free and voluntary agreement of the parties . . . ." It rejected "the claim that [husband] was forced to consent to [the MSA's] terms as a result of fraud, duress, or undue influence." The court credited the attorney's testimony that he had "observed nothing that suggested the agreement was anything other than what the parties freely and genuinely 'wanted' and consented to at the time it was signed." The court found the attorney's "testimony on this issue clear,

---

[3]The faxed agreement was silent on the repayment of the $100,000 note secured by husband's separate property in Texas. Nevertheless, the parties, both verbally and in writing, agreed that husband would be solely responsible therefor. The record shows that the allocation of this debt originated with the parties, not the attorney. The trial court factually found that if the loan proceeds were characterized as husband's separate property, he had made a gift to wife of whatever she realized therefrom.

credible and convincing." Furthermore, it concluded that, if husband's allegations of mistake were true, the mistake was insufficient to invalidate the MSA.[4]

Nevertheless, the trial court ruled that the MSA "may not be enforced because the conflict disclosures made by [attorney] were inadequate to permit his dual representation of the parties . . . ." Despite the attorney's role as a "scrivener," the trial court found that "he was effectively rendering legal advice to both [parties]" because he added "standard provisions" to the MSA. It concluded that "he could do so only after making full disclosure of all facts and circumstances necessary to enable both parties to make a fully informed decision regarding such representation." The trial court also said that the attorney failed to disclose "all facts and circumstances necessary to enable both parties to make a fully informed decision regarding [his] representation." It did not, however, specify the "facts and circumstances" that should have been disclosed.

### MSA Set Aside Rules

■ "Property settlement agreements occupy a favored position in the law of this state . . . ." (*Adams v. Adams* (1947) 29 Cal.2d 621, 624 [177 P.2d 265].) Courts are reluctant to disturb them "except for equitable considerations. A property settlement agreement, therefore, that is not tainted by fraud or compulsion or is not in violation of the confidential relationship of the parties is valid and binding on the court. [Citations.]" (*Ibid.*) Here the trial court found that the MSA was not tainted by fraud, duress, or undue influence. Nor was the MSA in violation of the parties' confidential relationship. The trial court found that the parties had voluntarily entered into the agreement, which reflected "what the parties freely and genuinely 'wanted' and consented to at the time it was signed."

The trial court may set aside an MSA on traditional contract law. "An MSA is governed by the legal principles applicable to contracts generally. [Citation.]" (*Tanner v. Tanner* (1997) 57 Cal.App.4th 419, 424 [67 Cal.Rptr.2d 204]; see also *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 13 [99 Cal.Rptr.2d 252, 5 P.3d 815] [premarital agreement].) These other grounds include mistake, failure of consideration, unlawfulness of the contract, and prejudice to the public interest. (Civ. Code, § 1689.)

The trial court also had the power to invalidate the MSA if it was inequitable. Family law cases "are equitable proceedings in which the court

---

[4]Contrary to husband's claim at oral argument, the record does not show, and the trial court did not find, that attorney was "protecting himself" or "overreaching" by reciting who would be responsible for attorney fees incurred in the two unrelated prior representations.

must have the ability to exercise discretion to achieve fairness and equity." (*In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1043 [31 Cal.Rptr.2d 749].) " 'Equity . . . will assert itself in those situations where right and justice would be defeated but for its intervention.' [Citation.]" (*Satterfield v. Garmire* (1967) 65 Cal.2d 638, 645 [56 Cal.Rptr. 102, 422 P.2d 990].) Thus, "marital settlement agreements may be set aside where the court finds them inequitable even though not induced through fraud or compulsion. [Citations.]" (*In re Marriage of Moore* (1980) 113 Cal.App.3d 22, 32 [169 Cal.Rptr. 619].)

### Conflict Disclosure

■ While the trial court mentioned its equitable powers, it is clear that it set aside the MSA solely because the attorney did not adequately disclose the potential conflict of interest. The trial court relied on *Klemm v. Superior Court* (1977) 75 Cal.App.3d 893 [142 Cal.Rptr. 509]. This case, however, does not hold that an MSA may be invalidated because of a potential inadequate disclosure of a conflict of interest. The issue before us is a matter of first impression.

*Klemm* concluded that the same counsel may represent both husband and wife in an uncontested dissolution proceeding if the conflict of interest is potential, not actual, and the parties give an informed, intelligent consent in writing after full disclosure. (*Klemm v. Superior Court, supra*, 75 Cal.App.3d at p. 900.) A conflict is potential in the absence of an "existing dispute or contest between the parties . . . ." (*Id.*, at p. 899.) In dicta, the *Klemm* court noted that counsel "who undertake to represent parties with divergent interests owe the highest duty to each to make a full disclosure of all facts and circumstances which are necessary to enable the parties to make a fully informed decision regarding the subject matter of the litigation, including the areas of potential conflict and the possibility and desirability of seeking independent legal advice. [Citation.]" (*Id.*, at p. 901.) The court went on to observe that "the validity of any agreement negotiated without independent representation of each of the parties is vulnerable to easy attack as having been procured by misrepresentation, fraud and overreaching. [Citation.]" (*Ibid.*)

But here the trial court factually found that the MSA was not procured by misrepresentation, fraud, or overreaching. *Klemm* does not suggest that an MSA may be invalidated solely for lack of informed consent to dual representation where the parties have freely and voluntarily entered into an agreement to which the attorney adds "standard MSA provisions." In fact, *Klemm* says: "The California cases are generally consistent with rule 5-102

[now rule 3-310 of the Rules of Professional Conduct] permitting dual representation where there is a full disclosure and informed consent by all the parties, at least insofar as a representation pertains to agreements and negotiations prior to a trial or hearing. (*Gregory* v. *Gregory* (1949) 92 Cal.App.2d 343, 349 [206 P.2d 1122] [marital settlement agreements] . . . .)" (*Klemm v. Superior Court, supra,* 75 Cal.App.3d at p. 898.) As to the "standard provisions" added by the attorney, it is sufficient to observe that not only did the parties agree thereto, these terms were not and are not in dispute.

Here, even if there was dual representation, there was informed consent within the meaning of Rules of Professional Conduct, rule 3-310 which, in pertinent part provides: "Avoiding the Representation of Adverse Interests. [¶] (A) For purposes of this rule: [¶] (1) 'Disclosure' means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client; [¶] (2) 'Informed written consent' means the client's or former client's written agreement to the representation following written disclosure[.] [¶] . . . . [¶] (C) A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict . . . ." (Rules Prof. Conduct, rule 3-310.)

Other than telling the parties what the attorney did tell them, the trial court did not articulate, husband does not suggest, and we cannot think of any further advisement which could have been made save telling the parties, consistent with the rule drafter's comment, that in the event of future litigation, there would be a waiver of the attorney-client privilege. (Evid. Code, § 962.) A single attorney acting as a scrivener should not advise the parties of the pros and cons of their agreement so that they might "unagree." This would defeat the very purpose for which they sought assistance.[5]

Advisement and waiver of a potential conflict of interest in typing an MSA should not be equated with the admonitions and waivers required when a guilty plea is entered to a criminal charge. (E.g., *People v. Newman* (1999) 21 Cal. 4th 413 [87 Cal.Rptr.2d 474, 981 P.2d 98]; *Boykin v. Alabama* (1969) 395 U.S. 238 [89 S.Ct. 1709, 23 L.Ed.2d 274]; *In re Tahl* (1969) 1 Cal.3d

[5]We can, of course, envision a situation where the parties' agreement is so grossly unfair or against public policy that an attorney would decline to act as a scrivener. This is not the present case. This was a short-term marriage with only property division, debt allocation, and spousal support at issue.

122 [81 Cal.Rptr. 577, 460 P.2d 449].) In *People v. Carpenter* (1997) 15 Cal.4th 312 [63 Cal.Rptr.2d 1, 935 P.2d 708], our Supreme Court held that a defendant charged with capital murder could orally waive a potential conflict of interest without first consulting with independent counsel. (*Id.,* at pp. 373-375.) A fortiori, spouses in a marital proceeding can waive a potential conflict of interest in writing to settle property and support issues.

Finally, nothing that the attorney did or did not do caused the parties to enter into the faxed agreement that was incorporated into the September 1998 MSA. As indicated, the trial court expressly credited the attorney's testimony to this effect. (*Ante,* p. 22.) Phrased otherwise, the parties both orally or in writing agreed to the essential terms of the September 1998 MSA on their own. Husband may not seize upon the subsequent conduct of the attorney to invalidate the MSA.

### *Disposition*

The judgment is reversed. The matter is remanded for enforcement of the September 1998 MSA. Wife shall recover her costs and reasonable attorney fees on appeal, to be decided by the trial court on noticed motion.

Coffee, J., and Perren, J., concurred.

APPENDIX

Angela and I agree to the following terms:

1) Until a new lease is signed Angie will receive from me by the 3rd of each month $750.
2) After the new lease is signed Angie will receive 50% of the new lease income after the money for the loan is taken into account. This money will be paid directly by Southland Corporation to Angie.
3) Should the new lease account for less than $2,000 a month for Angie, I agree to make up the difference.
4) Angie will receive 50% of the yearly percentage income given by Southland for the lease.
5) This agreement will be in effect for a maximum of five years or until Angie has regained her feet to include a stable job.
6) Angie will be responsible for $15,000 in legal fees for her defense and I will be responsible for those fees remaining that were incurred in my Paternity Case.
7) Angie will receive a copy of the new Lease after it is signed.

I hereby agree to the above:

Angela Egedi

I hereby agree to the above:

L. Paul Egedi