[No. B151847. Second Dist., Div. Six. July 15, 2002.]

In re the Marriage of JILL L. and KEITH FRIEDMAN.
JILL L. FRIEDMAN, Appellant, v.
KEITH FRIEDMAN, Respondent.

**COUNSEL**

Van Etten Suzomoto & Beckett; John Randolph Haag; Isobel M. Murray; Lascher & Lascher and Denise A. Brogna for Appellant.

Diane M. Matsinger and Gary R. Ricks for Respondent.

**OPINION**

**YEGAN, J.**—Judicial erasure of a competent adult's signature on an agreement does not serve the purpose of the law of contracts, i.e., to protect the reasonable expectations of the parties. (*Ben-Ziv v. Edmar* (1995) 40 Cal.App.4th 468, 475 [47 Cal.Rptr.2d 12].) Here the adult is not only competent, she is a competent lawyer. As we shall explain, at the time the postnuptial agreement was signed, the parties had reasonable expectations that they would not share in the fruits of each other's business achievements. The parties did not foresee that Keith Friedman's (husband) business would flourish to the extent that it did. Characterization of this asset is the driving force of the dispute.

In this action for martial dissolution, Jill L. Friedman (wife) appeals from an order that a 1991 postnuptial agreement is valid and enforceable. The trial court found that wife voluntarily entered into the agreement and that the agreement was not invalid because of alleged conflict of interest by the attorney who prepared it. We affirm. (See *In re Marriage of Egedi* (2001) 88 Cal.App.4th 17, 23-24 [105 Cal.Rptr.2d 518].)

*Facts and Procedural History*

In December 1990 wife worked as an attorney for a prestigious law firm. She met and fell in love with husband who had just sailed around the world and wanted to start a forensic consulting business. Husband and wife discussed marriage. Wife said that she wanted to keep her law practice as separate property if she married. Husband agreed.

Weeks after meeting wife, husband was diagnosed with leukemia. Lacking insurance for medical treatment, he decided "to go off sailing again and just die." Wife urged husband to undergo a bone marrow transplant and proposed marriage so that he could be placed on her medical insurance. This entreaty saved husband's life. He agreed and the parties married January 27, 1991.

Within days of the marriage, husband called his attorney, S. Timothy Buynak, Jr. Husband wanted to protect wife from creditors if he did not survive the medical treatment, which was a distinct possibility. Husband and wife met Buynak, a partner in the law firm of Hatch and Parent (H&P), on January 31, 1991. Buynak suggested a postnuptial agreement providing that their individual income, business property, and debts would be separate property. Husband's prior marriage ended with a bitter fight over a family business. Buynak explained that he was representing husband and that wife would have to retain separate counsel or represent herself.

On February 7, 1991, Buynak mailed them a draft agreement and engagement letter stating that he was representing husband, not wife: "In the execution of this Agreement and the other documents we are undertaking at this time, I, and my firm, can only represent Keith, as it would be a conflict of interest on our part to represent both parties in these transactions. Since Jill is an attorney, I presume that she will review the documents herself, or to the extent she chooses, have them reviewed by an attorney of her choice."

The postnuptial agreement contained a similar recital: "Jill is an attorney licensed to practice in California and is currently employed full time in that profession; and Keith is a self-employed business person. In entering this Agreement Keith is being represented by S. Timothy Buynak, Jr., of Hatch

and Parent, a Professional Corporation; and Jill is acting as her own legal counsel. Each party acknowledges that as to the preparation and review of this Agreement, that he or she has read this Agreement and is fully aware of the terms and contents of this Agreement." Buynak referred them to another H&P lawyer to create an estate plan. The other lawyer did so. The estate plan consisted of simple wills and durable powers of attorney.

Wife made changes to the postnuptial agreement, which were incorporated into the final draft and signed March 20, 1991. To protect against medical creditors, husband gifted his boat to wife.

Husband underwent a bone marrow transplant and fully recovered. During the marriage, the parties maintained separate bank accounts and separate businesses. Wife started her own law practice but also helped husband in his fledgling business.

Husband's business flourished beyond his and wife's dreams. The limited record on appeal does not disclose the actual value of this asset. It is, however, the source of significant dispute, which gives rise to this interlocutory appeal.

In 1997 or 1998, the parties experienced marital problems. Wife told husband to "get rid" of the postnuptial agreement and that she did not want "that postnuptial agreement hanging over my head anymore." Husband did not agree to do so.

On May 1, 2000, wife filed a petition for marital dissolution. Husband contended that the forensic consulting business was not community property. Wife claimed that the postnuptial agreement was invalid because Buynak prepared the agreement without obtaining a written conflict of interest waiver as required by Rules of Professional Conduct, rule 3-310(c).

The action was bifurcated to decide the enforceability of the postnuptial agreement. The trial court found that Buynak did not represent wife and that she "had ample time (a month) to consult with an attorney, if she chose to do so. Ms. Friedman is a bright woman. She is a trained attorney with three years of experience as a civil litigator at the time this event took place. The courtship, the elopement, the meetings with the attorney, the creation of the postnuptial agreement document, a month to review it—no one held a gun to her head and made her go into the lawyer's office and sign the document on March 20, 1991. She did so freely, voluntarily, intelligently with superior knowledge of the law and the rights that she was relinquishing . . . ."

The trial court stayed the proceedings and certified the matter for interlocutory appeal. (Cal. Rules of Court, rule 1269.5(b).) We deny husband's request to dismiss and proceed to the merits.

*Dual Representation: Potential Conflict of Interest*

Rule 3-310 of the Rules of Professional Conduct provides: "(C) A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter *in which the interest of the clients potentially conflict*; or [¶] (2) Accept or continue representation of more than one client in a matter *in which the interests of the clients actually conflict . . . .*" (Italics added.)

The discussion notes to Rules of Professional Conduct, rule 3-310 state: "Subparagraphs (C)(1) and (C)(2) are intended to apply to all types of legal employment, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship. Examples of the latter include the . . . preparation of an ante-nuptial agreement, or joint or reciprocal wills for a husband and wife, or the resolution of an 'uncontested' marital dissolution. In such situations, for the sake of convenience or economy, the parties may well prefer to employ a single counsel, but a member must disclose the potential adverse aspects of such multiple representation (e.g., Evid. Code, § 962) and must obtain the informed written consent of the clients thereto pursuant to subparagraph (C)(1). Moreover, if the potential adversity should become actual, the member must obtain the further informed written consent of the clients pursuant to subparagraph (C)(2)." (23 pt. 3 West's Ann. Codes, Rules (1996 ed.) foll. rule 3-310, p. 372.)

The trial court found that H&P represented both parties on the estate plan but not the postnuptial agreement. Citing *Flatt v. Superior Court* (1994) 9 Cal.4th 275 [36 Cal.Rptr.2d 537, 885 P.2d 950], wife argues that the dual representation on the estate plan created a conflict of interest that voids the postnuptial agreement. In *Flatt*, an attorney was retained by a new client to sue the attorney's existing client. The attorney was "confronted with a mandatory and unwaivable duty *not* to represent the second client in light of an irremediable conflict with the existing client . . . ." (*Id.*, at p. 279.) Unlike *Flatt*, there was no actual conflict of interest here. Although Rules of Professional Conduct, rule 3-310 prohibited joint representation if the parties had an actual conflict of interest, it did not prohibit Buynak from representing husband on the postnuptial agreement.

*Klemm v. Superior Court* (1979) 75 Cal.App.3d 893 [142 Cal.Rptr. 509] illustrates the principle. There the attorney represented the husband and wife in a uncontested dissolution proceeding after they agreed to waive support. The Court of Appeal held: "The conflict of interest was strictly potential and not present." (*Id.*, at p. 899.) The court, however, observed that "the validity

of any agreement negotiated without independent representation of each of the parties is vulnerable to easy attack as having been procured by misrepresentation, fraud, and overreaching. [Citation.]" (*Id.*, at p. 901.)

Here there was no misrepresentation, fraud, or overreaching. Wife was advised of the potential conflict and agreed to act as her own attorney. The trial court discredited wife's testimony that she did not read Buynak's letter and that the recitals in the postnuptial agreement were false. ■ On review, all conflicts in the evidence are drawn in favor of the judgment. (*In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 561-562 [20 Cal.Rptr.2d 132].) We may not reweigh the evidence or determine credibility. (*In re Marriage of Bower* (2002) 96 Cal.App.4th 893, 897 [117 Cal.Rptr.2d 520].)

■ We recently discussed similar issues in *In re Marriage of Egedi, supra,* 88 Cal.App.4th 17 (*Egedi*). There, the husband and wife hired an attorney to prepare a marital settlement agreement (MSA) and signed a conflict of interest waiver. After the wife fully performed her MSA obligations, the husband moved to set aside the MSA on the ground that the attorney's disclosures were insufficient to enable the parties to give informed consent to dual representation. Absent evidence of unconscionability or unfairness, we held that the husband could not disregard the waiver and "seize upon the subsequent conduct of the attorney to invalidate the MSA." (*Id.*, at p. 25.)

The same principle applies here. Wife was advised of the potential conflict of interest orally and twice in writing. She voluntarily entered into the postnuptial agreement. Acting as her own attorney, she made changes to the agreement and signed it. Because there was no actual conflict of interest, the oral and written advisement provided by H&P was sufficient. Assuming, arguendo, that rule 3-310 of the Rules of Professional Conduct required a written waiver for every potential conflict of interest that might arise in drafting the agreement, wife's signature on the 1991 postnuptial agreement was tantamount to a written waiver of any potential conflict. Even if there was a technical violation of rule 3-310, the violation was not serious enough to render the agreement unenforceable. (E.g., *Pringle v. La Chapelle* (1999) 73 Cal.App.4th 1000, 1006 [87 Cal.Rptr.2d 90] [attorney fee agreement]; *Egedi, supra,* 88 Cal.App.4th at p. 22 [marital settlement agreement].)

*Family Code section 1615*

In *In re Marriage of Bonds* (2000) 24 Cal.4th 1 [99 Cal.Rptr.2d 252, 5 P.3d 815], our Supreme Court held that the wife's lack of representation was

one of several factors to be considered in determining whether a premarital agreement was voluntary under Family Code section 1615. (*Marriage of Bonds*, at p. 24.) Evidence that the premarital agreement was prepared by husband's attorney and signed by wife without counsel did not automatically void the agreement.

In response to *Bonds,* the Legislature amended Family Code section 1615 to provide that a premarital agreement is not voluntary if a party is not represented by counsel when signing the agreement or the party fails to waive "in a separate writing, representation by independent counsel." (Fam. Code, § 1615, subd. (c)(1); Stats. 2001, ch. 286, § 2.) Effective January 1, 2002, Family Code section 1615, subdivision (c) creates the presumption "that a premarital agreement was not executed voluntarily unless the court finds . . . [¶] (1) The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel . . . ."

Wife's reliance on Family Code section 1615 is misplaced. This section does not govern postnuptial agreements. Premarital agreements are not interpreted and enforced under the same standards as interspousal agreements. (See *In re Marriage of Bonds, supra,* 24 Cal.4th at p. 27.) It is well settled that property settlement agreements occupy a favored position in California. (See, e.g., *Egedi, supra,* 88 Cal.App.4th at p. 22.)

### Breach of Fiduciary Duty

Wife argues that husband owed a fiduciary duty and that it is presumed that the postnuptial agreement was induced by undue influence. (Fam. Code, § 721, subd. (b); *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 293 [39 Cal.Rptr.2d 673].) That presumption was dispelled by the evidence. The trial court found that as an attorney, wife understood the scope and purpose of the postnuptial agreement. It found that husband "carried the burden of showing that Ms. Friedman was not induced to execute the postnuptial agreement through mistake, undue influence, fraud, misrepresentation, false promise, concealment, nondisclosure or any other breach of the Friedman's confidential relationship. There is no taint." We are bound by this factual finding. (*In re Marriage of Bower, supra,* 96 Cal.App.4th at p. 897.)

Substantial evidence supported the trial court's finding that the postnuptial agreement was "free of taint by fraud or compulsion; it was not obtained for

an illegal purpose as an attempted fraudulent conveyance; it was not obtained in violation of the confidential relationship of the parties, and it is not invalid because of the involvement of the law firm of Hatch & Parent in the preparation of the Agreement." The postnuptial agreement did not favor either party and protected wife's property from husband's creditors. The wills and durable powers of attorney also benefited wife and provided that husband's estate would pass to wife and her mother upon his death.

### Expert Testimony

■ Wife argues that the trial court erred in receiving expert testimony that H&P had no conflict of interest. Wife claimed that she was not prepared to cross-examine the expert. The trial court overruled the objection but granted a two-day continuance so that wife could prepare. Thereafter, wife cross-examined husband's expert and presented rebuttal expert testimony. We conclude that the expert opinion testimony was properly received to establish the duties owed by H&P. (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1087 [41 Cal.Rptr.2d 768].)

### Final Observations

■ As we stressed at the outset of our opinion, we review the legality of the 1991 postnuptial agreement at the time it was made. Where, as here, the agreement is lawful, either party may insist upon adhering to its letter. This protects the reasonable expectations of the parties at the time the bargain was struck. Subsequent events, whether unforeseen or fortuitous, and whether they favor one side or the other, should not dictate how we decide the legal issue here presented.

Wife's remaining arguments have been considered and merit no further discussion.

The order declaring the 1991 postnuptial agreement valid is affirmed. Husband is awarded costs on appeal.

Gilbert, P. J., and Coffee, J., concurred.

A petition for a rehearing was denied August 12, 2002, and appellant's petition for review by the Supreme Court was denied October 16, 2002.