[Nos. G045899, G046261. Fourth Dist., Div. Three. Dec. 3, 2012.]

In re the Marriage of RAYMOND and ROBERTA MELISSA.
RAYMOND MELISSA, Appellant, v.
ROBERTA MELISSA, Respondent.

**COUNSEL**

Shuff Law Firm and Tamara Shuff Mortensen for Appellant.

Minyard Morris, Lonnie K. Seide, Cara Elkin; Snell & Wilmer and Richard A. Derevan for Respondent.

## OPINION

**O'LEARY, P. J.**—Raymond Melissa (Raymond) challenges the trial court's invalidation of Roberta Melissa's (Roberta) spousal support waiver contained in a 1985 prenuptial agreement.[1] Raymond argues the court erred because the waiver "does not offend contemporary public policy" and the new rules requiring a spouse to be represented by independent counsel before waiving support cannot be retroactively applied. (See Fam. Code, § 1612.)[2] We conclude the trial court properly applied the law in effect when the parties signed the agreement, i.e., spousal support waivers were deemed invalid as being against public policy. We affirm the judgment.

I

In the summer of 1984, Raymond (then 41 years old) met Roberta (then 32 years old). Both had been married before. Raymond told Roberta he was retired but he had started another company. He owned a home in Newport Beach, a new Jaguar automobile, and had a net worth of over $2 million. She worked as a nurse and rented an apartment in Huntington Beach. After dating for a few months, they moved in together with the plan of deciding after six months whether to get married. When Raymond told Roberta he was not interested in marriage, she moved out.

Soon thereafter, the couple reconciled and decided to get married. They set a wedding date of August 8, 1985, and Roberta moved back in with Raymond. Around this same time, they learned Roberta was pregnant.

The parties disagree on when Raymond first asked Roberta to sign a prenuptial agreement. However, they agree it was clearly Raymond's condition to getting married. Raymond told Roberta his last divorce was very difficult and he did not want to pay spousal support. Raymond explained he would not get married unless she signed a prenuptial agreement. Roberta agreed to sign it.

Raymond asked Craig Willford, the attorney son of his neighbor, to draft the prenuptial agreement (Agreement). Raymond told Willford what he

---

[1] We refer to the parties by their first names for ease of reading and to avoid confusion, and not out of disrespect. (*In re Marriage of James & Christine C.* (2008) 158 Cal.App.4th 1261, 1264, fn. 1 [70 Cal.Rptr.3d 715].)

[2] All further statutory references are to the Family Code, unless otherwise indicated.

wanted included in the Agreement. Roberta had no input about the wording of the document. They executed the Agreement on August 5, 1985, at a bank in front of a notary.

The parties dispute when Roberta first saw the Agreement. Roberta recalled the first time she saw it was on August 5, three days before the wedding, and when all the invitations had already been sent out. Willford told her she could have her own attorney review the Agreement, but she did not do so. She did not understand some of the language in the Agreement. By contrast, Raymond recalled Willford came over the house in July to explain the Agreement to him and Roberta. He agreed with Roberta that they executed the document in August.

Willford could only "vaguely" remember the events. He did not recall meeting with Raymond or Roberta to go over the Agreement. Based on notes and dates in his file, Willford believed he did not prepare the Agreement until sometime in August.

The Agreement is approximately three pages long. It begins with the recital, "Both parties to this Agreement have made to each other a full and complete disclosure of the nature, extent, and probable value of all of their property, estate, and expectancies. In particular, Raymond . . . has disclosed his ownership of the single family residence in Orange County and holdings of corporate stock." No other specific disclosures of assets are made in the Agreement. Raymond recalls he told Roberta about his assets in March 1985.

The next recital stated Raymond was represented by counsel and Roberta was advised of the right to be represented by independent counsel. In addition, the Agreement stated Roberta "admits and acknowledges that any failure to seek independent counsel [did] not stem from any inducement of Raymond . . . or his counsel, but rather upon her having read the Agreement, understood it, and having made a knowledgeable waiver of the right to counsel in that regard. Both parties admit and acknowledge that they have read the Agreement, and understand its meaning and legal consequences."

The first term of the Agreement provided each party waived any claim "in the separate property of the other." In addition, the Agreement discussed spousal support: "Each of the parties acknowledge that while the case of *In re Marriage of Higgason* (1973) 10 [Cal.3d] 476 [110 Cal.Rptr. 897, 516 P.2d 289] (*Higgason*) . . . provides that the potential for the future right of spousal support cannot be waived by an agreement, the parties acknowledge that the law (relating to the authority of individuals to enter into contracts as such

authority is [a]ffected by the marital status of the parties) is in a state of flux (e.g. *Marvin v. Marvin* [(1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106]]). The parties do specifically state and acknowledge that each is currently capable of supporting himself or herself and that neither party is entering the marital relationship with the expectancy of developing reliance upon the earning capacity of the other. Therefore, for mutual consideration of this waiver and of the expected marriage, each party mutually releases the other and waives any potential future rights which would have or may have accrued for spousal support in the event of a legal separation, dissolution of marriage, or action therefore. The parties further agree that at anytime either changes his or her intention to become reliant upon the earnings of the other, notice of such change in intent shall be given to the other in writing."

The next term of the Agreement was concerned with what should occur when separate property is commingled with community property and how the community property should be valued. The final term stated separate property sold or reinvested during the marriage would remain separate property.

After the parties married, they had a son, R., who is mentally disabled, and also suffers from fragile X syndrome and autism. Roberta stopped working full time in 1997. The parties separated in October 2009, and Roberta filed her petition for dissolution in November 2009. After the separation, Roberta lived with and cared for R., who is now 24 years old. He is able to work part time as a janitor, earning $9 an hour. Roberta is unemployed.

The trial court granted Raymond's motion to bifurcate the issue of whether the Agreement was valid. The court heard testimony from four witnesses: Raymond, Roberta, Willford, and David Monkarsh (R.'s psychologist). After considering the briefing and oral argument, the court framed the issue as having three subparts: (1) Was the entire Agreement valid and enforceable? (2) Was the waiver in 1985 void as being against public policy? (3) If not void, was the waiver unenforceable due to it being "unjust or unconscionable"?

The court stated it would start with the second question, and after considering the *Higgason* case, the relevant statutes, and *In re Marriage of Pendleton & Fireman* (2000) 24 Cal.4th 39 [99 Cal.Rptr.2d 278, 5 P.3d 839] (*Pendleton*), the court concluded it must apply the law in effect in 1985. It determined the legal authority in 1985, including the *Higgason* case, was very clear that waivers of spousal support were void as against public policy. The court determined the *Pendleton* case, written after new legislation and legal amendments, did not overrule the *Higgason* case.

In addition, the court determined the spousal waiver was unenforceable as being unjust. The court stated it found both parties were credible witnesses; however, "This is a long-term marriage of 20 years or so. There is no dispute that at least during half of the marriage [Roberta] has not worked." The court stated Roberta stayed home to care for R. with Raymond's "consent" and "encourage[ment]."

Finally, the court stated the first question regarding the Agreement's validity was not difficult. The spousal support waiver could be severed from the rest of the Agreement, which was otherwise enforceable. It reasoned the parties were on equal footing in terms of how much money they had, their intelligence, and their understanding of the terms. The court noted Roberta's alleged failure to read the Agreement was not grounds to set it aside. It concluded, "I did not see any evidence of any duress, coercion, involuntariness, overreaching, or any of those other contract principles the court needs to consider for a 1985 [prenuptial agreement]." The court entered a partial judgment holding the spousal support waiver invalid.

Nearly a year later, Raymond filed a motion for reconsideration in light of the newly decided case *In re Marriage of Howell* (2011) 195 Cal.App.4th 1062 [126 Cal.Rptr.3d 539] (*Howell*) (2002 amendment to § 1612 regarding spousal support waivers cannot be retroactively applied). After a hearing, the court denied the motion on the grounds the motion was untimely and lacked merit.

The court filed another partial judgment in July 2011 regarding the parties' property settlement, a partial judgment in August 2011 resolving support issues, and in October 2011, it entered a final judgment resolving the remaining reserved issues. Raymond's appeal concerns only the court's ruling on the validity of the spousal support waiver.

II

A.  *The Evolution of Spousal Support Waivers*

The public policy against spousal support waivers dates back to 1872, when the Legislature enacted former section 159 of the Civil Code, providing, " 'A husband and wife cannot, by any contract with each other, alter their legal relations, except as to property, . . . and except that they may agree to an immediate separation, and may make provision for the support of either of them and of their children during such separation.' " (*Pendleton, supra,* 24 Cal.4th at p. 48, fn. omitted.)

This public policy was still in effect 100 years later, when in 1973, our Supreme Court concluded in *In re Marriage of Higgason, supra,* 10 Cal.3d 476 *(Higgason),* that premarital agreements designed to waive, diminish, or alter the statutory obligation of spouses to mutually support each other were contrary to public policy and therefore void and unenforceable. The court cited to a respected Harvard Law Review article and listed numerous cases holding this was the majority rule across the nation. *(Id.* at p. 486.)

The rationale for this rule was that marriage was considered more than a mere contract. It was regarded as a social institution vital to society's stability. " 'Inasmuch as the state rests upon the family and is vitally interested in the permanency of a marriage relation once established, it, for the promotion of public welfare, and of private morals as well, makes itself a party to every marriage contract entered into within its jurisdiction, in this sense, that it will not permit the dissolution thereof by the other party thereto. Its consent in the form of a decree of its court passed after hearing in due process of law, is a prerequisite for a divorce. . . . Courts will not enforce any contract which is the price of consent by one party to the marriage relation, to the procurement of a divorce by the other.' And, in reference to a similar agreement to that in the case at bar, the court in the case just cited said: 'Presumably each party saw in that agreement an individual advantage; to him, in that he possibly paid her less thereby than the judgment of the court upon hearing would compel; to her, in that he refrained therefor from answering the allegations of her petition by proof, and thus possibly permitted a divorce which he could have prevented.' " *(Pereira v. Pereira* (1909) 156 Cal. 1, 5 [103 P. 488].)

"Another concern was that a man should not be able to contract before marriage against the liability to his wife that he would incur should he commit offenses against the wife during the marriage. [Citation.]" *(Pendleton, supra,* 24 Cal.4th at p. 48.) In the 19th century, "divorce could be granted only on the grounds of adultery, extreme cruelty, willful desertion, willful neglect, habitual intemperance, or conviction of a felony, and could be denied on grounds, inter alia, of connivance or collusion—the 'corrupt consent' by one party to the other's commission of an act constituting cause for divorce or an agreement between the parties that one should commit, appear to commit, or represent to the court that one had committed such an act. [Citations.] The husband had exclusive control of the community property with 'absolute power of disposition (other than testamentary) as he ha[d] of his separate estate' [citation] and a wife could not contract for the payment of money. [Citation.] The court was empowered to order the husband to pay alimony on divorce if the divorce was granted for an offense of the husband [citation], but had no power to order a wife to pay alimony. [¶] The assumptions underlying the refusal to enforce premarital waivers of spousal support were that the state had a vital interest in and should act to ensure the

permanency of the marriage relation [citation], and that this interest was undermined by such waivers, assumptions reflected in statutory law governing marriage, dissolution, and property rights." (*Id.* at p. 51.)

Finally, public policy at that time deemed marriage to be inextricably tied to society's welfare: " 'The welfare of society is so deeply interested in the preservation of the marriage relation, and so fraught with evil is regarded whatever is calculated to impair its usefulness, or designed to terminate it, that it has long been the settled policy of the law to guard and maintain it with a watchful vigilance. Although marriage, in the eye of the law, is a civil contract, unlike any other civil contract, it cannot be rescinded or annulled by consent of the parties to it. . . . That high office can only be performed by a court of competent jurisdiction, for some specified cause prescribed by law, upon proof taken in a suit for that purpose. The good order and well being of society, as well as the laws of this state, require this. And so strict and careful are courts in the administration of this justice, out of regard for the public morals and the general welfare of society, that they will esteem it their duty to interfere upon their own motions whenever it appears the dissolution is sought to be effected by the connivance or collusion of the parties; and all contrivances or agreements, having for their object the termination of the marriage contract, or designed to facilitate or procure it, will be declared illegal and void as against public policy.' " (*Pendleton, supra,* 24 Cal.4th at pp. 50–51.)

Consistent with this policy, the *Higgason* court determined spouses assume mutual obligations of support when they marry. In that case, a wealthy 73-year-old woman married a much younger man, who lacked financial resources. At issue before the *Higgason* court was an agreement in which both spouses waived all interests in property and spousal support. The court concluded the waiver of support was against public policy because it sought to alter the wife's statutory obligation to support the husband. (*Higgason, supra,* 10 Cal.3d at p. 485.)

The Supreme Court in *Higgason* explained antenuptial agreements relating "to the disposition of the property of the respective parties" were enforceable. (*Higgason, supra,* 10 Cal.3d at p. 485.) The court will uphold agreements "made in contemplation that the marriage relation will continue until the parties are separated by death. Contracts which facilitate divorce or separation by providing for a settlement only in the event of such an occurrence are void as against public policy. [Citations.]" (*Ibid.*) "[T]here is a clear implication that if an antenuptial agreement relieves the husband from the obligation of supporting and maintaining his wife during the continuance of the proposed marriage relation, it will be held invalid to that extent." (*Ibid.*)

Three years after *Higgason*, our Supreme Court in *In re Marriage of Dawley* (1976) 17 Cal.3d 342 [131 Cal.Rptr. 3, 551 P.2d 323] (*Dawley*), revisited the issue of the validity of prenuptial agreements. In that case, the parties had agreed before marriage that the earnings and property acquired during marriage would be held as separate property because the parties anticipated an early dissolution of their marriage. The parties also agreed the husband would support the wife " 'for the minimum period' " of 14 months. (*Id.* at p. 353.) The marriage lasted longer than expected and when the couple separated, the wife argued the agreement was void based on dictum in *Higgason* stating an antenuptial agreement " 'must be made in contemplation that the marriage relation will continue until the parties are separated by death.' " (*Dawley, supra*, 17 Cal.3d at p. 346, quoting *Higgason, supra*, 10 Cal.3d at p. 485.) The court clarified this dictum did "not accurately state California law." (*Dawley*, at p. 346.)

The *Dawley* court explained, "Enforcement of the state policy to foster and protect marriage [citation] does not require the invalidation of entire agreements based upon the subjective contemplation of the parties; it requires only that the courts refuse to enforce specific contractual provisions which by their terms seek to promote the dissolution of a marriage. [¶] . . . California courts have uniformly held that contracts offend the state policy favoring marriage only insofar as the terms of the contract 'facilitate,' 'encourage,' or 'promote' divorce or dissolution." (*Dawley, supra*, 17 Cal.3d at pp. 349–350.)

In a footnote, the *Dawley* court commented that although several cases asserted "that an agreement which 'facilitates' dissolution violates public policy, this terminology is misleading. In a literal sense, any contract which delimits the property rights of the spouses might 'facilitate' dissolution by making possible a shorter and less expensive dissolution hearing. But public policy does not render property agreements unenforceable merely because such agreements simplify the division of marital property; it is only when the agreement encourages or promotes dissolution that it offends the public policy to foster and protect marriage." (*Dawley, supra*, 17 Cal.3d at p. 350, fn. 5.)

However, the *Dawley* court was not asked to consider the validity of a spousal support waiver. It acknowledged the decisions cited in *Higgason* invalidating a spouse's waiver of support rights because it promoted divorce, and noted there were not similar decisions striking down a contract that "merely provided that the earnings and accumulations of each spouse will be held as separate property." (*Dawley, supra*, 17 Cal.3d at p. 351.)

Thus, to briefly summarize, in 1985, the status of the law was that prenuptial agreements would be enforced if the provisions did not objectively

encourage or promote dissolution. There was no per se rule invalidating premarital agreements. However, it was also determined any written waiver of the statutory obligation of spouses to mutually support each other was void as being contrary to public policy.

Raymond and Roberta's Agreement recognized the rule invalidating any attempt to waive spousal support, as described by the Supreme Court in *Higgason*. However, their Agreement suggested the parties nevertheless wished to include a spousal support waiver based on their purported belief the law on this issue was in a "state of flux" based on the Supreme Court case *Marvin v. Marvin, supra*, 18 Cal.3d 660. The statement is puzzling because the *Marvin* case simply addressed how cohabitating *unmarried couples* may create enforceable express or implied contracts to address the rights, obligations, and remedies for property, support and other "marital-type" claims (unless the agreement is made for the rendition of sexual services). (See *id.* at p. 674.) So-called "*Marvin* claims" arise out of nonmarital cohabitation only. The *Marvin* court simply recognized adults who voluntarily live together are "competent as any other persons to contract respecting their earnings and property rights." (*Ibid.*) The court held those parties "may order their economic affairs as they choose, and no policy precludes the courts from enforcing such agreements." (*Ibid.*) A *Marvin* claim for breach of contract is resolved in a civil lawsuit. The case had nothing to do with the status of family law or with the then existing public policy denouncing spousal support waivers in a premarital agreement.

The issue was not in a "state of flux" until after the Legislature adopted the Uniform Premarital Agreement Act (Uniform Act) as part of the Civil Code, effective January 1, 1986 (reenacted in 1994 as Fam. Code, § 1600 et seq.). In adopting the Uniform Act, the Legislature deleted the subdivision which would have expressly permitted the parties to modify or eliminate spousal support. (See *Pendleton, supra*, 24 Cal.4th at p. 43, fn. 3 [discussion of legislative history].)

Subsequently, courts interpreted the Legislature's decision to leave out the subdivision authorizing support waivers as signifying the Legislature intended to leave the enforceability of spousal support waivers to the courts. (*Pendleton, supra*, 24 Cal.4th at p. 45.) This interpretation is supported by the legislative history: Several reports issued by the Assembly Subcommittee on Administration of Justice noted California courts currently did not permit enforcement of spousal support waivers, but the reports also acknowledged there was a growing split in authority among the other states on this issue. (*Ibid.*)

The adopted portion of the Uniform Act relating to premarital agreements, now found in section 1612, permitted the parties to contract with respect to

property rights. Specifically, the parties could agree on the right to manage and control property, the disposition of property after death, the making of testamentary documents, death benefits, choice of law, and "[a]ny other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty." (§ 1612, subd. (a)(7).) Section 1612, subdivision (b), clarified the right of a child to support could not be "adversely affected by a premarital agreement."

We note Raymond and Roberta executed their Agreement before the Uniform Act was adopted and before it became effective in 1986. Consequently, it would not control their Agreement. In any event, the Legislature intentionally omitted language that would change existing California case authority holding spousal support waivers invalid. Public policy had not yet evolved on the issue to prompt the Legislature to expressly recognize and condone such waivers.

It was not until 2000 that our Supreme Court recognized there had been a shift in public policy towards spousal support waivers. In *Pendleton, supra,* 24 Cal.4th at pages 48 to 49, the court explained, "It is clear that the Legislature understood that the omission of authorization for premarital waivers of spousal support in section 1612 would leave the law as it was in 1985. The subcommittee reports reflect that understanding. . . . We will not presume that the Legislature intended that the law remain static. It would be unreasonable to assume that the Legislature intended the common law of the 19th century to govern the marital relationship in the 21st century. The most reasonable understanding of the Legislature's purpose when it omitted subdivision (a)(4) is that it was satisfied with the evolution of the common law governing premarital waivers of spousal support and intended to permit that evolution to continue. Had the Legislature intended to forbid spousal support waivers, it is logical to assume that it would have done so by expressly including spousal support in subdivision (b) of section 1612, which [forbids waiver of child support]. [In analyzing premarital agreements,] the court is free to reexamine the assumptions that underlie the common law rule that premarital spousal support waivers promote dissolution and for that reason contravene public policy. [We conclude] the common law policy, based on assumptions that dissolution of marriage is contrary to public policy and that premarital waivers of spousal support may promote dissolution, is anachronistic."

The court in *Pendleton* noted the shift in public policy was nationwide: "Some 41 jurisdictions have already abandoned the common law restrictions on premarital waivers of spousal support. In 21 jurisdictions, premarital waivers of spousal support are authorized by statutes that either adopt all or substantially all of the provisions of the Uniform Act. One jurisdiction (New York) had other statutory authorization for such waivers, and in another 18

the right to enforce a premarital waiver of spousal support exists pursuant to judicial decision." (*Pendleton, supra,* 24 Cal.4th at p. 49, fns. omitted.)

In addition, the court reasoned, "Both public attitude and contemporary official policy have changed substantially over the past century. Public policy continues to favor and encourage marriage, but it now acknowledges that lifetime commitment is no longer the norm. When legitimate grounds for dissolution exist, dissolution does not contravene public policy, but is the preferred solution. [Citation.] The adoption of the California Uniform Premarital Agreement Act itself reflects recognition that permanency is no longer a dominant characteristic of modern marriage. The Family Law Act of 1969 (Civ. Code, former § 4000 et seq.) permitted, and now the Family Code permits, no-fault dissolution. (§ 2310.) A stipulation governing division of community property, once held . . . to be collusive and to violate public policy [citation], today is expressly allowed (§§ 2550, 2554), encouraged, and no longer condemned as facilitating dissolution. [Citation.] . . . [¶] Legal recognition also has been given to the changing position of married women who, in increasing numbers, are employed outside the home and have been given equal right to management of the property of the community as well as primary right to manage businesses they are operating. (§ 1100.) Public policy toward spousal support has also changed. While spouses must support each other during marriage (§ 4300), the court has been given greater discretion in marital dissolutions to deny spousal support altogether or to limit such support in an amount and duration that reflects the ability of both parties in contemporary unions to provide for their own needs. (§§ 4330, 4320.)" (*Pendleton, supra,* 24 Cal.4th at p. 52.)

The *Pendleton* court concluded, "These changes in the relationship between spouses and support obligations in particular . . . clearly warrant reassessment of what remains of the rule that premarital waivers of spousal support may promote dissolution and, if they do so, are unenforceable. Public policy, to the extent that it is reflected in these legislative acts, no longer reflects concern that premarital waivers of property rights threaten the marriage relationship. Section 1612 expressly permits the parties to contract with regard to numerous property rights, including '[t]he disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event.' (§ 1612, subd. (a)(3).) No basis appears on which to distinguish premarital waivers of spousal support from agreements governing property rights insofar as either has a potential for promoting dissolution. . . . [¶] We need not decide here whether circumstances existing at the time enforcement of a waiver of spousal support is sought might make enforcement unjust. It is enough to conclude here that no public policy is violated by permitting enforcement of a waiver of spousal support executed by intelligent, well-educated persons, each of whom appears to be self-sufficient in property and earning ability, and both of whom have the

advice of counsel regarding their rights and obligations as marital partners at the time they execute the waiver. Such a waiver does not violate public policy and is not per se unenforceable as the trial court believed." (*Pendleton, supra,* 24 Cal.4th at pp. 53–54, fn. omitted.)

In a footnote, the court stated, "The Legislature may, of course, limit the right to enter into premarital waivers of spousal support and/or specify the circumstances in which enforcement should be denied." (*Pendleton, supra,* 24 Cal.4th at p. 53, fn. 12.) And that is exactly what occurred in response to the *Pendleton* opinion.

In 2002, the Legislature amended the statutory scheme to require spouses to be represented by independent counsel before waiving spousal support in a premarital agreement. The Legislature added subdivision (c) to section 1612, providing, "Any provision in a premarital agreement regarding spousal support, including . . . a waiver of it, is not enforceable if the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision was signed . . . ."

In addition, section 1615 was amended to create a presumption that a premarital agreement was not executed voluntarily unless the court makes five designated findings. (See Stats. 2001, ch. 286, § 2, p. 2317; *In re Marriage of Friedman* (2002) 100 Cal.App.4th 65, 72 [122 Cal.Rptr.2d 412].) These include the finding the party against whom enforcement is sought had at least seven calendar days between the date he or she was "first presented" with the agreement and advised to seek independent counsel, and the time he or she signed the agreement. (§ 1615, subd. (c)(2).)

█ In *Howell, supra,* 195 Cal.App.4th 1062, the court held section 1612, subdivision (c), invalidating a spousal support waiver executed in the absence of independent counsel did not apply retroactively. The court reasoned the enactment of subdivision (c) of section 1612 constituted a material change in the law, that " 'in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature . . . must have intended a retroactive application.' [Citations.]" (*Howell, supra,* 195 Cal.App.4th at p. 1074.)

█ Thus, over the past 25 years the case law and statutory rules regarding spousal support waivers has evolved significantly. The rules and underlying public policy regarding support waivers has swung like a pendulum from the one extreme of complete prohibition, to the other extreme of being condoned but highly regulated with technical requirements and safeguards. While we no longer believe prenuptial agreements containing spousal

support waivers encourage dissolution or will harm society, we are also well aware of the need for safeguards to ensure fairness and voluntariness.

## B. *Raymond and Roberta's 1985 Premarital Agreement*

Raymond argues Roberta's waiver of spousal support in 1985 would not be considered contrary to contemporary public policy. He asserts the court correctly applied 19th-century legal principles permitting premarital agreements without independent counsel or any of the requirements listed in section 1615, but the court erroneously applied public policy existing in 1985. He provides no case authority, and we found none, supporting his legal theory the trial court must apply the law existing on the date of execution but ignore the public policy supporting the rules that existed at that time (applying instead contemporary public policy but not modern day rules). It is a somewhat puzzling argument lacking a sound rational basis.

■ Fortunately, it is well settled that "The law applicable to the validity and enforcement of premarital agreements turns on the date of execution." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2012) ¶ 9:141, p. 9-36.16 (rev. # 1, 2012).) As discussed in some detail above, the applicable law is different depending on whether the court is analyzing (1) pre-1986 agreements (before adoption of the Uniform Act), (2) agreements executed in the period between 1986 and 2002 (before amendment of the Uniform Act), and (3) post-2002 agreements (when the Uniform Act was amended with technical requirements for valid spousal support waivers that are not retroactive).

This case involves a pre-1986 agreement. When Raymond and Roberta signed their premarital agreement in 1985, the law and public policy as articulated by our Supreme Court in *Higgason* was in full effect. As correctly noted by the trial court, under *Higgason*, a waiver of spousal support was unenforceable. Indeed, the parties acknowledged the waiver was most likely invalid in their own Agreement. The trial court properly applied the law existing in 1985 in considering the validity of the Agreement and the spousal support waiver provision.

Relying on *Pendleton*, Raymond asserts the trial court should have applied "contemporary public policy" permitting spousal support waivers for that is exactly what the *Pendleton* court did. We find he has misinterpreted the holding of the case. The *Pendleton* case, decided in 2002, concerned interpretation of a premarital agreement executed in 1991, which the court recognized was governed by the provisions of the Uniform Act. (§ 1600 et seq.) The court's application of "contemporary public policy" in reaching its conclusion a spousal support waiver could be enforced, was based in large

part on its reliance on the "legislative acts" in adopting the Uniform Act. (*Pendleton, supra*, 24 Cal.4th at p. 53.)[3] As discussed in more detail above, the court concluded the Legislature omitted language that would have expressly permitted spousal support waivers in favor of letting the courts consider the issue, keeping pace with the evolving public policy.

The *Pendleton* court determined public policy had significantly shifted since enactment of the Uniform Act, and it deemed spousal support waivers were permitted under section 1612, subdivision (a)(7), a statutory provision that did not exist when Raymond and Roberta executed their Agreement. That provision simply stated parties could contract with respect to any rights and obligations "not in violation of public policy." (§ 1612, subd. (a)(7).) We find the *Pendleton* court's holding is limited to whether a 1991 premarital agreement waiving spousal support, controlled by the Uniform Act and more recent public policy, was enforceable. The trial court correctly concluded the case was not applicable.

■ We conclude the trial court properly applied the law as it then existed in 1985. It would be unfair to apply the law and public policy as it existed between 2000 and 2002 (in effect after the *Pendleton* case), but not also give Roberta the benefit of the many safeguards and protective requirements enacted for post-2002 agreements, i.e., requiring independent legal representation and seven days between when the agreement is presented to a party and the time it is signed. (§ 1615, subd. (c)(1) & (2).)[4] The Legislature's 2002 amendments reflect the most current "contemporary public policy" concerning spousal support agreements, and not surprisingly, Raymond is not interested in applying the true current state of the law. The trial court correctly determined the 1985 waiver was unenforceable, applying the holding of *Higgason* and majority rule existing at the time.

---

[3] As noted by Roberta, the *Pendleton* court never explains whether it was applying public policy at the time the parties signed their agreement in 1991, the time of their trial (1996–1997), or the time of its decision in 2000. We need not consider the issue because all these events took place after the Legislature adopted the Uniform Act in 1986. However, we find Roberta's comment reflects Justice Kennard's dissenting opinion stating that the majority opinion in *Pendleton* failed to "articulate guidelines for the bench and bar explaining when, if ever, such waivers are enforceable." (*Pendleton, supra*, 24 Cal.4th at p. 59 (dis. opn. of Kennard, J.).) "The majority's silence on these important questions does a disservice to the public, the bar, and the bench." (*Id.* at p. 60 (dis. opn. of Kennard, J.).) As mentioned above, the Legislature responded to the *Pendleton* decision by creating new rules and guidelines. Needless to say, Raymond does not want this court to consider contemporary public policy as reflected by this legislative action because the new rules render Roberta's spousal support waiver invalid.

[4] In light of this ruling, we need not address the court's alternative ground for deeming the spousal support waiver invalid on the basis it would be unjust to enforce it.

## III

The judgment is affirmed. Respondent shall recover her costs on appeal.

Rylaarsdam, J., and Fybel, J., concurred.

A petition for a rehearing was denied January 2, 2013, and the opinion was modified to read as printed above. Appellant's petition for review by the Supeme Court was denied March 20, 2013, S208011.