Filed 12/10/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ADOPTION OF S.S. et al., Minors. | |
| M.S. et al.,<br>        Plaintiffs and Respondents,<br>v.<br>T.S. et al.,<br>        Defendants and Appellants. | A162155<br><br>(San Mateo County Super. Ct.<br> Nos. AD016393, AD016394) |

The question before us is whether the trial court had the authority to amend final adoption orders to include a postadoption contact agreement that had not been properly presented to the adoption court for review and approval at the time the adoption petitions were granted.

More than three years after adoption orders were entered for two siblings, the adoption agency and the children's biological grandparents moved the court to amend the orders to include the postadoption contact agreement the grandparents and adoptive parents executed prior to the adoption. The contact agreement had not been provided to the adoption court and thus not considered or made part of the original adoption orders. The trial court determined, as a matter of law, that it had no jurisdiction to consider the motion to amend because the adoption court which had originally granted the adoptions had not made the necessary judicial

1

determinations as to whether the postadoption contact agreement was executed voluntarily and in the best interests of the children. It therefore deemed the postadoption contact agreement invalid and unenforceable.

The trial court erred in ruling it did not have the authority to amend the adoption judgments. As a court of equity, it could have used its equitable powers to amend the judgments to include the parties' agreement in the interests of fairness and justice. The trial court also erroneously ruled that the grandparents could not show the adoptive parents were barred from opposing the amendment under the doctrine of equitable estoppel, as it misapplied the law in concluding that evidence of fraud or an intentional or deliberate misrepresentation was necessary for the doctrine to apply. We reverse and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

**A.    Initial Adoption by Grandparents**

Stephen S. was born in 2009, and his sister Mary S. was born in 2012. Upon Mary's birth, both children were placed in the dependency system. Initially, they were detained in the care of their maternal grandmother but within a few months were removed from her home and placed in a shelter. In March 2013, they were placed in the care of their paternal grandmother Karen B. and her husband Scott B. In December 2014, Karen and Scott formally adopted both children.

For Karen, "[t]aking care of a toddler and an infant was exhausting, and took a real physical and emotional toll on [her]." After Karen shared these difficulties with the wife of her ex-husband Tom S.–Stephen and Mary's biological paternal grandfather–she and Tom agreed to have Stephen stay with them. (Karen and Tom, the children's biological paternal grandparents

2

and the appellants, are referred to as the "Grandparents".) Though the children did not live together, they still saw each other several times a week.

## B. Re-Placement for Adoption

Karen and Scott, then in their 60s, recognized there was "a good chance [they] would not be able to raise the children to their adulthood." While Karen "very much wanted to raise the children," she also wanted them to "have younger parents who could be more active and live to see them get married and perhaps have children of their own." She wanted for her and Scott to "play typical grandparent roles." They decided it was in the children's best interests to be raised by others while remaining "a large part of their lives."

Therefore, soon after finalizing their own adoption of the children, Karen and Scott contacted Adoption Connection of Jewish Family & Children's Services ("Adoption Connection"), a licensed adoption agency, and asked that the children be re-placed for adoption. According to social worker Tara Noone, Adoption Connection's Director of Adoptive Services, Karen and Tom "made clear that they wanted the children to remain part of [their] families and that the openness of the adoptions therefore was of primary importance to them."

Noone sent out a "pre-screening email" to a limited group of families on the agency's adoption waitlist who met the criteria for placement and might be interested in a placement of siblings with whom the birth family "wanted a very high level of contact to continue after the adoptions." Noone "presented the special circumstances up front, in that initial email, in an effort to assure that we only would be presenting families to Tom and Karen that were comfortable with the high level of contact being requested. Only a

3

small group of families responded to the email to indicate an interest, including [Claire S. and James S.]."

### C. Adoption Process with New Prospective Parents

Around January 2015[1], Noone contacted Claire, a bank attorney, and James about the potential adoption of Stephen and Mary. In February, Claire and James met with Karen and Scott and then the children. According to Grandparents, "In all of [their] discussions with [Claire and James], [they] emphasized [their] intention to remain in [their] grandchildren's lives." Over the next several months, the adoption process got underway, and Claire and James spent time with the children and made plans for their adoption.

In March, Adoption Connection presented Claire and James with a plan for the children to transition into their full care with a proposed end date of June, at which point the children would live with them permanently. In April, at Karen's request, the final transition date shifted from June to August.

#### 1. Postadoption Contact Agreement

In July, Grandparents hired attorney Karin Stoeckenius to prepare a postadoption contact agreement. That same month, Tom appears to have had some communication with Claire regarding the agreement and then conveyed to Noone that it had upset Claire. On July 23, Tom sent Claire and James their proposed agreement. Claire and James wrote to Adoption Connection stating that they "did not want to sign anything that would create new obligations."

On August 3, Stephen moved in with Claire and James. The next day, Claire and James asked to see a draft of the postadoption contract agreement

---

[1]     All further dates refer to 2015 events unless otherwise noted.

4

proposed by Grandparents, and Karen provided it. On August 11, Claire sent revisions to Noone and Stoeckenius. Soon after sending her revisions, she wrote to Noone: "I am sorry but I cannot sign the agreement as is. They are not last[-]minute changes. We waited to submit them until we knew Karen was ready to move forward so that we did not subject her to additional attorney's fees unnecessarily. If I remember correctly, Karen and Tom have 30 days to change their mind, i.e.[,] rescind the relinquishment documents so I do not see the problem with them signing today and having the corrections incorporated into the visitation agreement in the next day or so."

On August 11, Karen and Scott each signed an Adoption Connection form entitled "Request for Postadoption Contact Agreement." The request documented their desire "to create a legally binding written agreement for postadoption contact that will be acceptable to [them] and the adoptive parents of [the children]."

That same day, Karen and Scott also signed relinquishments concerning Stephen and Mary, surrendering them for adoption to Adoption Connection. Their relinquishments named Claire and James as prospective adoptive parents for the children. The "Statement of Understanding" accompanying their relinquishments stated in part: "I understand that the prospective adoptive parent(s) and the birth relatives, including the birth parents, may enter into an enforceable written agreement to permit continuing contact between the birth relatives, including the birth parents, and the child if the court approves." According to Adoption Connection's outside counsel, on information and belief, this delay was "to assure that the relinquishment did not become final until a [postadoption contact agreement] had been negotiated and executed by all parties." On August 14, Mary moved in with Claire, James, and Stephen.

5

The final version of the parties' postadoption contract agreement (the "PACA"), dated August 14, was a two-page document that began with the following "Intention Statement": "This post adoption contact agreement is being entered into for the benefit of the children to be adopted, [Mary] and [Stephen]. [Claire and James], adoptive parents, agree that it is their intent to maintain an open adoption with Mary and Stephen's biological grandparents, Karen B[.] and Tom S[.]. Karen and Tom wish to return to their role as grandparents. All parties believe that it is in Mary and Stephen's best interest to maintain contact with Karen and Tom, and plan to be flexible and supportive about future contact in service of this goal. [¶] Karen and Tom wish to have a loving and supportive role in Mary and Stephen's life as their grandparents, which [James] and Claire will encourage. [James] and Claire's intent is to help Mary and Stephen build strong relationships with their new family, while at the same time maintaining an open and supportive grandparent relationship with Karen and Tom."

The PACA established the following visitation schedule: During summer vacations, Stephen and Mary could visit with the Grandparents "for a combined minimum of 14 days." If the Friday, Saturday, or Sunday after Thanksgiving is available, the children could visit the Grandparents for a post-holiday dinner at one of their homes. During the week of Easter and Christmas, the children could visit if in town and available. There was also an optional visit of one overnight a month with Grandparents. The dates, times, and locations of the visits would be mutually agreed upon. In addition, the PACA stated that Grandparents would have reasonable phone calls and emails with the children, and that Claire and James would keep Grandparents "reasonably informed of [the children's] academic progress and

extracurricular activities" and that Grandparents could attend their events when appropriate.

The agreement further stated: "Should any part of this Agreement be deemed invalid, the remainder is severable and shall remain in full force. This is an entire contract. Any modifications or amendments must be in writing, signed by the parties. This Agreement is entered into in the State of California, and shall be governed by the laws of the State of California." It concluded with disclosures under Family Code section 8616.5, subdivisions (e), which advised that an adoption cannot be set aside due to the failure of a party to abide by the PACA, and other disclosures under Family Code section 8616.5, subdivision (h), setting forth the circumstances under which such an agreement may be modified or terminated. According to Noone, the PACA "was the most detailed, most specific, longest PACA [she] had ever seen."

Between August 18 and 19, Karen and Tom, and Claire and James executed the PACA.

### 2. Other Post-Placement Activities

From October 2015 through January 2016, Adoption Connection made monthly visits to Claire and James's house and prepared post-placement reports for each child describing each child's development, how the family was adjusting as a family unit, and how Stephen and Mary were adjusting to living together. In nearly all the reports, Adoption Connection noted that Stephen was thriving and Mary was doing well with Claire and James, viewed their placement as "wonderful," and recommended the placements remain unchanged.

Each report also included a section on "Birthparent Relationships." Several of the reports noted that the children saw Grandparents and their

spouses regularly, during meals, weekly soccer games, and holidays. When Claire returned to work, Karen took care of Mary twice a week, and Stephen saw his grandmother when he and James picked up Mary. According to the December 2015 report, Tom was planning to host a birthday party for Stephen attended by the whole family.

In the later reports, however, tensions between Grandparents and Claire and James surfaced. The December report noted that Claire and James "have been working on communication with Mary's grandmother, and feel it is improving. They are also very careful to speak positively about Mary's birth family in front of her, even if they disagree with actions taken by Mary's grandmother." The January 2016 report observed that "communication [was] challenging between the birthparents and Claire and [James], as they have different standards regarding response time. Claire and [James] also feel like they have different expectations regarding frequency of contact. Claire and [James] receive frequent and sometimes last-minute requests to get together, and sometimes they do not respond because they feel overwhelmed, and are managing visit requests from their own families as well. This has seemingly led to hurt feelings on the part of members of the birth family."

On December 31, days before Adoption Connection's January post-placement visit, the agency wrote to Claire and James with guidance on finalizing the adoptions. In the two-page letter, Adoption Connection explained that, after the four post-placement visits, it would prepare a court report which would include the legal documents it had regarding the adoption. Adoption Connection further advised Claire and James to file their ADOPT-200 Adoption Request form with the county court, noting they could

prepare the various court forms themselves or with the assistance of an attorney but that many families completed the forms on their own.

The letter also included a three-page document prepared by Adoption Connection entitled "Legal Procedures" for "Domestic Adoption," which appears to be a standard information sheet given to adopting families. The information sheet listed seven documents Adoption Connection would prepare and/or submit to the court as part of the adoption finalization process. Immediately below this list, five forms to be prepared by the adopting parents or their attorney are identified: (1) the ADOPT-200 Adoption Request form; (2) the ADOPT-310 Contact After Adoption Agreement form, noting parenthetically "(if agreement will be filed with court)"; (3) the ADOPT-210 Adoption Agreement form; (4) the ADOPT-230 Adoption Expenses form; and (5) the ADOPT-215 Adoption Order form. As to the Contact After Adoption Agreement, the document explained: "[I]f you and the birthparent(s) will be completing a binding contact agreement, this form should be filed with the court at the same time as your Adoption Request—ADOPT-200. You may use the ADOPT-310 as a cover sheet for the actual agreement by filling in the basic information on page 1. On page 2, in the signature section, please write in 'See Attached Agreement for All Signatures,' and make sure to attach the signed agreement. *Note: if the birthparent(s) did not request a contact agreement, you do not need to prepare this form nor file it with the court*." (Italics in original.) After the adopting parents file the necessary forms with the court, the information sheet states, "You must also send us a stamped copy of the Contact After Adoption Agreement—ADOPT 310, if the birthparent(s) requested a legally binding agreement." (Emphasis omitted.)

9

In February 2016, Claire and James filed with the court adoption requests for each child using the ADOPT-200 form. The standard five-page form included a "Contact after adoption" section, with an option to indicate whether the "Contact After Adoption Agreement (form ADOPT-310)" is attached, would not be used, would be filed later, or was undecided. They checked the box indicating such contact "is undecided at this time."

In June 2016, Adoption Connection filed its final post-placement reports for each child (the "Final Reports"). Each report noted that Claire and James met with the children's legal parents prior to the transition into their home, and that "[t]hey agreed to have an open adoption that includes visits, phone calls, emails, and photo exchanges." In its "Evaluation" section, Adoption Connection said it had completed its investigation of Claire and James' motivation to adopt, understanding of adoption issues, physical and social environment, finances, history and current functioning, personal characteristics, child rearing practices, and family relationship. The agency recommended that the adoption of the children be granted as being in the best interests of both children.

### D. Adoption Orders

On July 22, 2016, the trial court granted the adoption petitions. The court signed an adoption order for each child on the ADOPT-215 form, which included various sections for the judge to complete. Section 9 contained a checkbox to indicate whether the judge approved a "Contact After Adoption Agreement (ADOPT-310)." The judge did not check the box in either order.

### E. Postadoption Difficulties

Tom said that after the children moved in with Claire and James, "all was well." Eventually, however, the relationship between Claire and James (referred to henceforth as the "Adoptive Parents") and Grandparents became

10

strained. In their appellate brief, Grandparents state that "it became more difficult for [them] to schedule visits." In their brief, Adoptive Parents say they "abided by the agreement, despite their concerns about favoritism, unequal treatment and separation of the children on visits with appellants."

In July 2018—about two years after the children's adoptions—Karen and Scott wrote a letter to Claire and James, stating, "We believe the time has come to meet with an adoption professional for support with our post-adoption agreement. [¶] The children are important to all of us and we want to figure out a way to work together for them. . . [W]e want to take steps so our relationship can grow in a positive direction." The parties were not able to resolve their differences through mediation.

In late August 2019, Claire, James, and the children moved across the country for James's work. Around this time, Grandparents came to understand that the PACA was not made part of the court's adoption orders.

### F.     Motion to Amend Adoption Orders

On January 8, 2020, Adoption Connection filed a request to "Amend Judgment of Adoption to Include Post Adoption Contact Agreement," which the parties had signed in August 2015 but which had not been made part of the court's adoption order. Deborah Wald, outside counsel for Adoption Connection, submitted a declaration in support of the agency's request. Wald stated the agency conducted a file review and found "no indication of an intention by any party that the PACA not be filed with the Court and included as part of the Court's final Order of Adoption." On information and belief, she stated the original PACA signed by all parties was in the court file but was never attached to an ADOPT-310 form or formally entered as an order of the court. She added, "After diligent efforts by the Agency to determine what occurred at the time of finalization, it remains unclear who

11

was supposed to attach the PACA to an Adopt-310 and bring it to the court's attention so it would be included in the Judgment. However, there is nothing in the Agency file to indicate the Agency was informed at any time of a change of heart by any party with regard to the PACA."

Adoption Connection also filed an addendum to its June 2016 Final Reports which summarized the PACA and indicated that when the original Final Reports were written, "it was the Agency's recommendation that the PACA was in the child's best interest and should be included in the Judgment." In addition, the agency prepared and filed an ADOPT-310 form to which it attached the signed PACA.

In February 2020, Adoptive Parents filed their opposition to Adoption Connection's request. Their counsel submitted a declaration stating he had personally examined the court files for the adoption and that neither the original nor a copy of the PACA was in the file, other than the copies the Agency had filed a month earlier with its motion to amend.

Claire and James filed separate supporting declarations. Both noted that the adoptions had now been final for 3.5 years. They said they never saw the relinquishments, the Statements of Understanding, or the Requests for Postadoption Contact Agreement which Grandparents had completed for Adoption Connection until January 2020, when they were attached as exhibits to the agency's request for an amendment. They admitted to signing the PACA, but explained: "At no time were we presented with an ADOPT-310 form, which appears to be a mandatory form, until we saw these proposed forms a few weeks ago as part of the pleadings of Attorney Deborah Wald. The two-page agreement, prepared by Grandparents' attorney Stoeckenius, does not contain any signature line for a judge, nor was the ADOPT-310 form, which would be a court order, if signed by all parties and

12

the judge, presented to us." Adoptive Parents continued, "We feel we were forced to sign this 'agreement' six months into our adoption process . . . after both children were in our home, after they had bonded with us and we with them . . ." According to them, "At no point during the transition period did any of the grandparents raise the issue of a visitation agreement and insist that [they] sign such a document." They further added, "We have fulfilled, both in letter and in spirit, what we agreed to do as to contact between the grandparents and the children, always considering what is in [their] best interest[s]. This has not always been easy." They made clear that they did not agree to have any postadoption contact retroactively ordered by the court or any of the adoption orders amended and expressed their "vehement[]" opposition to any court order as to the level of contact the children have with Grandparents.

On March 16, 2020, Grandparents moved to join Adoption Connection's request to amend the adoption order and each filed a supporting declaration. Karen stated, "In all of our discussions with [Claire and James], we emphasized our intention to remain in our grandchildren's lives." Both Karen and Tom stated that their intent was always "ongoing, frequent contact, and both we and Adoption Connection made that abundantly clear." Both Grandparents further stated, "It is clear . . . that the PACA signed by [Claire and James] and by [us] was meant to be part of the adoption order. It was only through an oversight by someone at some point that it was not made part of the order."

On December 2, 2020, after months of delay due to the suspension of normal court operations arising from the COVID-19 pandemic, the court heard Grandparents' joinder motion and granted the request. The court invited the parties to brief the issue of whether "the law permits the final

13

adoption decree, that was filed on July 22, 2016, to be amended."  Trial briefs were submitted by all parties.

On December 22, 2020, the trial court heard Adoption Connection's motion to amend the adoption judgments to include the PACA.  There was no witness testimony, but the declarations submitted were accepted by the court.  Initially, the court observed that the parties were in agreement that they had negotiated the PACA, and the PACA was intended to be a formal agreement.  The court further observed that the parties abided by the agreement for a period of time after the adoption, which reflected a belief among the parties that the PACA existed.

However, the court concluded that the PACA was "legally invalid and unenforceable."  The court provided an extensive explanation for its decision.  As an initial matter, the court found no fraud on the part of Claire and James but characterized the events as a series of "missteps" or "mistakes" resulting in the parties' current predicament.[2]  The court rejected Adoption Connection's argument that the court could amend the adoption orders as a court of equity and also rejected Grandparents' contention that the Adoptive

---

[2]      We defer to the trial court's finding that Adoptive Parents committed no fraud and that court's conclusion that the PACA was not filed as a result of missteps or mistakes.  Based on these findings, we refer to Adoptive Parents' non-filing of the PACA as a "mistake."  There is still, however, an ongoing dispute as to whether Adoptive Parents' intentionally did not file the ADOPT-310 form and PACA in order to seek a later advantage.

Adoptive Parents repeatedly assert they had no duty to file the ADOPT-310 form despite the requirement to submit any postadoption contact agreement entered into to the court, as set forth in Family Code section 8714, subdivision (c):  "If the petitioner has entered into a postadoption contact agreement with the birth parent as set forth in Section 8616.5, the agreement, signed by the participating parties, *shall* be attached to and filed with the petition for adoption . . ."  (Emphasis added.)

14

Parents should be equitably estopped from challenging the PACA. The court added that it "ha[d] found no authority indicating that an adoption order may be amended to include a Post-Adoption [Contact] Agreement that was not originally incorporated into the adoption decree and not reviewed by the Court."

The court further explained that the trial court reviewing the adoption in 2016 had made no judicial determinations that the PACA at issue was in the children's best interest or entered into voluntarily. In part, this was because Adoption Connection's Final Reports did not adequately address those matters and made no express reference to the PACA. Nor was the mandatory ADOPT-310 form provided to the court for consideration and signature. Other adoption forms also made no reference to a PACA. Absent this information, the court in 2016 had made none of the findings needed for the PACA's judicial approval. Deeming the PACA "legally invalid and unenforceable," the court denied the motion to amend the adoption orders to include the PACA. Grandparents now appeal.

## DISCUSSION

### A. Applicable Law

"The basic purpose of an adoption is the 'welfare, protection, and betterment of the child,' and adoption courts ultimately must rule on that basis. [Citation.] While the child's 'best interest' is 'an elusive guideline that belies rigid definition,' obviously overall '[i]ts purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.'" (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 437 (*Sharon S.*).)

15

The law acknowledges that some adopted children may benefit from contact with birth relatives. To this end, Family Code[3] section 8616.5, subdivisions (a) and (b)(1), authorize "postadoption contact agreements." "Postadoption contact agreements are intended to ensure children of an achievable level of continuing contact when contact is beneficial to the children and the agreements are voluntarily executed by birth relatives . . . , and adoptive parents." (§ 8616.5, subds. (a); see also § 8616.5(b)(1) [adoption laws shall not be construed to prevent adopting parents and birth relatives from "voluntarily executing a written agreement to permit continuing contact"].) Such agreements are also intended as a tool to promote a relative's interest in adoption, and to expedite legal permanency for children who cannot return to their parents. (*In re Kimberly S.* (1999) 71 Cal.App.4th 405, 407.)

As section 8616.5 suggests, the court may encourage adoptive parents to agree to the terms of a postadoption contact agreement, but it cannot require them to do so. (*In re Celine R.* (2003) 31 Cal.4th 45, 55.) At its core, such an open adoption is an agreement between the individuals involved, not a mandate by the court. (See Cal. Rules Court, rule 5.451(b) ["No prospective adoptive parent or birth relative may be required by court order to enter into a contact-after-adoption agreement."].)

The terms of postadoption contact agreements are limited to the subjects of visitation, contact, and the sharing of information about the child in the future. (§ 8616.5, subd.(b)(2)(A)-(C); Cal. Rules Court, rule 5.451(d)(1)-(9).) The agreements also must contain certain warnings in bold type, such as notice that the adoption cannot be set aside after it has been granted by

---

[3]     All further statutory references are to the Family Code unless stated otherwise.

16

the court due to a party's failure to follow the terms of the postadoption contact agreement.  (§ 8616.5, subd. (e)(1)-(3).)

According to the Rules of Court, "[t]he agreement must be prepared and submitted on *Contact After Adoption Agreement* (form ADOPT-310) with appropriate attachments."  (Cal. Rules Court, rule 5.451(f).)  If a petitioner for adoption "has entered into a postadoption contact agreement with the birth parent as set forth in Section 8616.5, the agreement, signed by the participating parties, shall be attached to and filed with the petition for adoption" filed in the county court.  (§ 8714, subd. (c).)

A licensed adoption agency which is a party to or joins in a petition for adoption must "submit a full report of the facts of the case to the court." (§ 8715, subd. (a).)  "If a petition for adoption has been filed with a postadoption contact agreement pursuant to Section 8616.5, the report shall address whether postadoption contact agreement has been entered into voluntarily, and whether it is in the best interest of the child who is the subject of the petition."  (§ 8715, subd. (c); see also Cal. Rules Court, rule 5.451(g) ["If a contact after adoption agreement has been submitted, the report must include a summary of the agreement and a recommendation as to whether it is in the best interest of the child."].)

Any postadoption contact agreement that allows birth relatives to continue visitation and other contact with a child following adoption must be found by the court to be both voluntary and in the best interests of the child. Section 8616.5, subdivision (b)(1) states:  "Nothing in the adoption laws of this state shall be construed to prevent the adopting parent or parents [and] the birth relatives, . . . from voluntarily executing a written agreement to permit continuing contact between the birth relatives, . . . if the agreement is found by the court to have been executed voluntarily and to be in the best

17

interests of the child at the time the adoption petition is granted." (§ 8616.5, subd. (b)(1).) Section 8616.5, subdivision (c) adds in pertinent part: "At the time an adoption decree is entered pursuant to a petition filed pursuant to Section 8714 . . . , the court entering the decree may grant postadoption privileges if an agreement for those privileges has been executed. . . ." (§ 8616.5, subd. (c); see also Cal. Rules Court, rule 5.451(c) ["If, at the time the adoption petition is granted, the court finds that the agreement is in the best interest of the child, the court may enter the decree of adoption and grant postadoption contact as reflected in the approved agreement."].)

"Enforcement of the postadoption contact agreement shall be under the continuing jurisdiction of the court granting the petition of adoption." (§ 8616.5, subd. (f).) Section 8616.5, subdivisions (f) and (h) provide for the enforcement of postadoption contact agreements by that court and also specify the circumstances under which a court can modify or terminate the agreements. (See § 8616.5, subds. (f), (h)(1)-(2)(A)-(C); see also Cal. Rules Court, rule 5.451(h) and (i).)

Even where a postadoption contact agreement exists between birth parents and adoptive parents, the subsequent refusal of an adoptive parent to comply with the agreement does not affect the adoption. (See § 8616.5, subd. (e)(1) [a postadoption contact agreement must contain a warning that "the adoption cannot be set aside due to the failure of an adopting parent . . . to follow the terms" of the agreement]; Cal. Rules Court, rule 5.451(k) ["Once a decree of adoption has been entered, the court may not set aside the decree, rescind any relinquishment, modify or set aside any order terminating parental rights, or modify or set aside any other orders related to the granting of the adoption petition, due to the failure of any party to comply with the terms of a postadoption contact agreement or any subsequent

18

modifications to it."]; *In re C.B.* (2010) 190 Cal.App.4th 102, 128, fn. 7.) Also, any disagreement or litigation brought to enforce or modify the agreement will not affect the validity of the adoption or serve as grounds for orders affecting the child's custody. (§ 8616.5, subd. (e)(2).)

" 'The rule is that the adoption statutes are to be liberally construed with a view to effect their objects and to promote justice. Such a construction should be given as will sustain, rather than defeat, the object they have in view.' " (*Sharon S.*, *supra*, 31 Cal.4th at p. 426.)

## B. Trial Court's Jurisdiction to Amend Adoption Order

Grandparents argue the trial court erred in ruling that it had neither the authority nor discretion to amend the adoption order to include the PACA the parties had executed.

This question appears to present an issue of first impression with respect to a trial court's jurisdiction to amend a final adoption order to add a postadoption contact agreement which had been executed by the parties but was mistakenly not presented to the court for approval at the time it finalized the adoption. The trial court found no case law on this issue. The parties have not cited any case, nor have we found any, that addresses this legal issue, which we review de novo. Under the circumstances of this case, we conclude the trial court, as a family law court of equity, had jurisdiction to amend the adoption orders to include the parties' PACA in the exercise of its equitable powers. Thus, the trial court could and should have considered whether the PACA was executed voluntarily and in the best interests of the children at the time the adoption was granted.

As an initial matter, it is well established that "[f]amily law court is a court of equity." (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 38; *In re Marriage of Schu* (2014) 231 Cal.App.4th 394, 401;

19

see also *In re Marriage of Klug* (2005) 130 Cal.App.4th 1389, 1403 [" 'Family courts are courts of equity…' "].)  "The object of equity is to do right and justice.  It 'does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention." (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749,770; see also *In re Marriage of Egedi* (2001) 88 Cal.App.4th 17, 23.)  " 'It has always been the pride of courts of equity that they will so mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication.' " (*Times-Mirror Co. v. Superior Court* (1935) 3 Cal.2d 309, 331.)  With their broad equitable power to fashion any appropriate remedies, courts of equity "may consider any unjust or harsh results, and adopt means to avoid them.  [Citation.]  'Equitable relief is by its nature flexible, and the maxim allowing a remedy for every wrong [citation] has been invoked to justify the invention of new methods of relief for new types of wrongs.' " (*Shapiro v. Sutherland* (1998) 64 Cal.App.4th 1534, 1552.) Accordingly, family law proceedings " ' "are equitable proceedings in which the court must have the ability to exercise discretion to achieve fairness and equity." ' " (*In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175.)

Nonetheless, " ' " '[r]ules of equity cannot be intruded in matters that are plain and fully covered by positive statute.' " ' " (See *Timberline, Inc. v. Jaisinghani* (1997) 54 Cal.App.4th 1361, 1368, fn. 5.)  When the Legislature has addressed a specific situation, a court cannot wholly ignore the statutory mandate in favor of equitable considerations.  (*Ibid.*)  Nor will a court of equity ever "lend its aid to accomplish by indirection what the law or its clearly defined policy forbids to be done directly." (*Lass v. Eliassen* (1928) 94

20

Cal.App. 175, 179; *Bi-Rite Meat & Provisions Co. v. City of Hawaiian Gardens Redevelopment Agency* (2007) 156 Cal.App.4th 1419, 1433, fn. 12.)

Here, the trial court prefaced its ruling with this statement: "I understand that Adoption Connection feels the Court can fix this as a court of equity. I understand that position, but I think that is not the case here." A moment later, the court acknowledged that "[a] series of mistakes led us to where we are today," before ultimately concluding that the failure to present the PACA to the trial court that granted the adoption petition in 2016 doomed the requested amendment by precluding it from considering the amendment in 2020.

It is evident from the trial court's statements that it declined to consider the requested amendment to the adoption order based on its belief it lacked the authority to do so. In so doing, it did not account for its full authority to act as a court of equity and was mistaken.

We have identified no statute that precludes such an amendment to an adoption order. California's adoption statutes appear in division 13 of the Family Code, which is divided into three parts. Part I (§§ 8500-8548) provides definitions throughout. Part 2 (§§ 8600-9206) addresses adoption of unmarried minors, and part 3 (§§ 9300-9340) adoption of adults and married minors. (See *Sharon S.*, *supra*, 31 Cal.4th at pp. 424–425.) Parts 1 and 2, the pertinent parts for the adoptions of unmarried minors Stephen and Mary, contain no statutory provision that prevents a trial court from amending an adoption judgment generally, or specifically to include a postadoption contact agreement. Section 8616.5's declaration that "*[n]othing in the adoption laws of this state shall be construed to prevent the adopting parent or parents [and] the birth relatives, . . . from voluntarily executing a written agreement to permit continuing contact*" underscores the importance of recognizing such

21

agreements, as long as "the agreement is found by the court to have been executed voluntarily and to be in the best interests of the child at the time the adoption petition is granted."  (§ 8616.5, subd. (b)(1), emphasis added.)

Further, the injustice of the situation before it was plain to the court and equally apparent to us.  The birth relatives of two minor children who had conditioned relinquishment on their PACA with the adoptive parents discovered the adoption court had not been properly presented and thus had never approved their PACA when it finalized the children's adoption orders. The court conveyed to the parties it understood how "significant," "serious," and "very important" the issue was.  It further recognized that, at minimum, "[a] series of mistakes led [the parties] to where [they] were today."  The court observed, "Somebody made a big mistake here."  The court added, "I'm stunned that this could even happen – that this could happen.  But it has happened.  And, yes, there should be somebody monitoring the store. Somebody who is neutral who is ensuring that both the grandparents and the adoptive parents are following what they agreed upon.  No one did that here. [¶]  So, yes, there is a problem there, and it does concern the Court very much.  This is too easy to not fill a box out and not submit a form to the Court and it has this kind of consequence."  In the court's view, foreclosing amendment to the adoption orders as a matter of law under the circumstances appeared to be a "harsh" result.  These were sound assessments.

Critically, while the court readily recognized "the focus is the best interest of the children," its decision did not account for the children's best interests, which must serve as the basis for the adoption court's rulings.  (See *Sharon S.*, *supra*, 31 Cal.4th at p. 428.)  Grandparents were Stephen and Mary's birth relatives—their biological paternal grandparents—with whom

22

the children had preexisting relationships. The children had been had cared for by Grandparents, who appeared highly involved in the lives of both children. Karen was one of their adoptive parents for a short while and cared for Mary twice a week postadoption. They shared meals and holidays together. The PACA expressed Grandparents' intent "to have a loving and supportive role in Mary and Stephen's life as their grandparents." Repeatedly, the court remarked that "it would be in the best interest of the children to have contact with their grandparents." The errors related to the presentation of the PACA to the adoption court made even more vulnerable the limited contact Stephen and Mary had with Grandparents, and susceptible to being severed altogether. That a process mistake involving forms and court filings could play such a consequential role in depriving the children of contact with Grandparents should not be without a remedy. In adoption-related matters, consideration of the children's best interests need not have been disregarded.

In addition, through no fault of their own, Grandparents faced the prospect of little to no contact with their grandchildren absent the PACA and their myriad efforts to place the children in an open adoption. They opted to work with Adoption Connection because it was adept at open adoptions. They designated Claire and James as prospective adoptive parents in part because they believed them to be amenable to the high level of postadoption contact they sought. They retained an attorney to draft the PACA, an indicator of the seriousness with which they approached the agreement. Karen conditioned her relinquishment of the children on the execution and existence of the PACA. Due to process errors, Grandparents, too, were at risk of being deprived of the benefits of the PACA, namely an ongoing, loving relationship with their grandchildren.

As a court of equity, the trial court had the ability to exercise its equitable powers under these circumstances to consider the request for an amendment if justice so required, even if no express authority authorized such an amendment. In order to achieve fairness and equity, the court could have considered amending the adoption orders to include the PACA which had been fully executed by the parties at the time of the 2016 adoption request but which through mistake was not presented to the court, so long as the PACA met the voluntariness and best interest requirements for approval.

Adoptive Parents argue equity cannot "subvert positive law." They assert that the statutory requirements in sections 8616.5 and 8715 for judicial and agency approval of a postadoption contact agreement before it is incorporated into an adoption is "the functional equivalent of a statute that prevents amendment." We disagree. Section 8616.5 is an expansive section of the adoptive statutes governing all aspects of postadoption contact agreements. (See § 8616.5, subd. (a)-(l).) It allows for a postadoption contact agreement "if the agreement is found by the court to have been executed voluntarily and to be in the best interests of the child at the time the adoption petition is granted." (§ 8616.5, subd. (b)(1).) Section 8715 requires an adoption agency's report to the court regarding an adoption case to "address whether the postadoption contact agreement has been entered into voluntarily, and whether it is in the best interest of the child who is the subject of the petition" when an adoption petition has been filed with such an agreement. (§ 8715, subd. (a)-(c).) While these provisions establish process requirements and conditions for judicial approval of a postadoption contact agreement, neither statute precludes amendment of an adoption order.[4]

_____

[4] Adoptive Parents' argument that "positive law is being subverted" is premised in part on their mistaken belief that the court's amendment of the adoption orders would bypass the judicial determination set forth in section

24

In addition, courts may not act contrary to statute only "where the clear purpose of the statute is to restrict or limit the power of the court to act." (*In re E.M.* (2014) 228 Cal.App.4th 828, 843.) Adoptive Parents have cited no language in either section 8616.5 or 8715 that purports to limit or otherwise preclude the court's ability to modify an adoption order when justice so requires. The silence of these statutes on the question of amendment cannot deprive the court of equity of its inherent powers to ensure the administration of justice. (See Code Civ. Proc., § 473, subd. (a)(1) ["The court may, in furtherance of justice, and on any terms as may be proper, allow a party to amend any pleading or proceeding by . . . correcting a . . . mistake in any other respect . . . ."]; cf. *County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1228 ["[E]ven where relief is no longer available under statutory provisions, a trial court generally retains the inherent power to vacate a default judgment or order on equitable grounds where a party establishes that the judgment or order was void for lack of due process [citations] or resulted from extrinsic fraud or mistake."].) Nor can these statutes be relied upon to override a court's obligation to promote the best interests of the child by subsequently considering whether or not to amend an adoption order.

Had the Legislature wanted to restrict the court's authority, it certainly could have done so. There are multiple examples of such statutes in the context of dependency and family law. (See, e.g., Welf. & Inst. Code, § 366.26, subd. (i)(1) ["Any order of the court permanently terminating

8616.5 as to whether the PACA was executed voluntarily and was in the best interests of the children at the time the adoption petitions were granted. In recognizing the court's ability to amend an adoption order, we do not disregard the need for the court to make these determinations. (See Section D, *infra.*) Hence, none of the statutory requirements of section 8616.5 or 8715 are subverted, nor is judicial review circumvented.

25

parental rights under this section shall be conclusive and binding upon the child, upon the parent or parents . . . . After making the order, the juvenile court shall have no power to set aside, change, or modify it, except . . . ."]; § 7894, subd. (b) ["After making the order and judgment [terminating parental rights], the court has no power to set aside, change, or modify it."].) Neither section 8616.5 nor 8715 or any other part of the adoption statutes establishes a similar bar to modifying an adoption order.

Indeed, certain provisions in the adoption statutes show the Legislature was not resistant to altering adoption orders. Section 8601.5 allows a court to "issue an order of adoption and declare that it shall be entered nunc pro tunc when it will serve public policy and the best interests of the child . . ." (§ 8601.5, subd. (a).) It provides, "The request for nunc pro tunc entry of the order shall be stated in the adoption request or *an amendment thereto*, and shall set forth specific facts in support thereof." (§ 8601.5, subd. (b), emphasis added.) In referencing "an amendment" to an adoption request, the statute contemplates the possibility of an earlier adoption request acted upon by the court subject to the sought-after change. Sections 9100 and 9102 govern actions or proceedings to "vacate, set aside, or otherwise nullify" orders of adoption on any ground. (§ 9100, subd. (a) [authorizing a court to set aside adoption order for adopted child who shows evidence of developmental disability or mental illness as a result of conditions existing before adoption]; § 9102, subd. (a)-(c) [addressing vacation of adoption on other grounds].) Thus, even adoption orders, which bear on the permanency and stability of children, are not shielded from change.

Here, the trial court should have acknowledged its own inherent ability as a court of equity to correct a mistake under the circumstances of this case. In that capacity, it had the power to amend the adoption orders with the

PACA if it found it was voluntary and in the best interests of the children at the time the adoption petitions were granted. In not recognizing this authority, it erred.

### C. Equitable Estoppel

Grandparents argue the trial court misapplied the law when it foreclosed their argument that Adoptive Parents were precluded from opposing the amendment under the doctrine of equitable estoppel. They contend the court erroneously concluded that evidence of fraud or intentional or deliberate misrepresentation was necessary for the doctrine to apply. Again, we agree.

"[E]quitable estoppel is not a punitive notion, but rather a remedial judicial doctrine employed to insure fairness, prevent injustice, and do equity. It stems from the venerable judicial prerogative to redress unfairness in the application of otherwise inflexible legal dogma, based on sound public policy and equity." (*Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1270; *Jarboe v. Hanlees Auto Group* (2020) 53 Cal.App.5th 539, 555 ["the linchpin of the estoppel doctrine is fairness"].) "The object of equitable estoppel is to 'prevent a person from asserting a right which has come into existence by contract, statute or other rule of law where, because of his conduct, silence or omission, it would be unconscionable to allow him to do so.'" (*Skulnick v. Roberts Express, Inc.* (1992) 2 Cal.App.4th 884, 891; see also *In re Marriage of Valle* (1975) 53 Cal.App.3d 837, 840 ["Generally speaking, the doctrine of equitable estoppel is a rule of fundamental fairness whereby a party is precluded from benefiting from his inconsistent conduct which has induced reliance to the detriment of another."].)

" 'Four elements must ordinarily be proved to establish an equitable estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his injury.' " (*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 59.) "Reliance by the party asserting the estoppel on the conduct of the party to be estopped must have been reasonable under the circumstances." (*Mills v. Forestex Co.* (2003) 108 Cal.App.4th 625, 655.)

"The determination of whether a defendant's conduct is sufficient to invoke the doctrine is a factual question entrusted to the trial court's discretion." (*Cuadros v. Superior Court* (1992) 6 Cal.App.4th 671, 675.) "Whether the trial court provided legally sufficient reasons for determining that the doctrine of equitable estoppel does not apply . . . presents a question of law that we review de novo." (*Hopkins v. Kedzierski* (2014) 225 Cal.App.4th 736, 748.)[5]

---

[5]     Our review of an equitable estoppel decision is an issue of law reviewed de novo only when the evidence is not in conflict. (See *Pittsburg Unified School Dist. v. Commission on Professional Competence* (1983) 146 Cal.App.3d 964, 980, fn. 4 [review of an estoppel determination is an issue of law only when the evidence is not in conflict]; *Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 226, fn. 9 ["In California, absent conflicting evidence, we review the issue de novo . . . as the question is whether the undisputed facts constitute a sufficient legal basis for the application of equitable estoppel."].) Grandparents assert that because "it was undisputed [Adoptive Parents] signed the agreement and were supposed to file it with the court," we should apply the doctrine as a matter of law and order the judgment amended. Adoptive Parents contend they "did not agree to file the forms nor did they have any duty to file the forms.". Because facts appear to be in conflict, we do not determine as a matter of law Adoptive Parents were

28

The trial court found the doctrine of equitable estoppel "inapplicable to the facts here" and did not consider whether Grandparents had established each element of estoppel. The court noted that Grandparents did not provide the court with any "authority indicating that the Court can consider an estoppel claim after judgment has been entered." The court further explained that "Grandparents had not provided evidence of an 'intentional' or 'deliberate' misrepresentation, and therefore cannot establish the elements of equitable estoppel." Neither was a legally sufficient reason to bar estoppel.

As we discussed, *ante*, the court's equitable powers enabled it to consider the equities even after the entry of the adoption order. As to the absence of evidence of intentional or deliberate misrepresentation, such evidence is not required for the doctrine of equitable estoppel to apply. The court in *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 162, explained: "While the statutory formulation might suggest that equitable estoppel is limited to situations amounting to fraud (intentionally and deliberately misleading another), estoppel 'has not been so narrowly applied.' [Citations.] Equitable estoppel has been applied in a broader context, where the party to be estopped has engaged in inequitable conduct, induced another party to suffer a disadvantage, and then sought to exploit the disadvantage. [Citation.] 'Broadly speaking, "estoppel" refers less to a doctrine than to a conceptual pattern, first articulated in the courts of equity, which has come to pervade our law. When it is successfully invoked, the court in effect closes its ears to a point—a fact, argument, claim, or defense—on the ground that to permit its assertion would be intolerably unfair. It is commonly said that the party to

---

estopped from asserting their opposition to the requested amendment and it will be left for the trial court to determine the matter in its discretion.

be estopped, having conducted himself in manner X, will "not be heard" to assert Y.' " (*Ibid.*)

That equitable estoppel does not require proof of fraud or intentional or deliberate misrepresentation is well recognized. (See *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 384 [" ' "[a]n estoppel may arise although there was no designed fraud on the part of the person sought to be estopped" ' "]; *Superior Dispatch, Inc. v. Insurance Corp. of New York* (2010) 181 Cal.App.4th 175, 187 [same]; *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 487–488 [application of equitable estoppel not limited to situations amounting to fraud]; cf. *Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 43 ["[i]t is not necessary that the defendant acted in bad faith or intended to mislead the plaintiff" to be estopped].) The trial court erred in concluding proof of fraud or intentional deceit was necessary for Grandparents to prevail on their estoppel argument, and Adoptive Parents' heavy emphasis on the court's finding that they did not commit fraud in disputing estoppel is unavailing.

Adoptive Parents also assert Grandparents have "unclean hands" which forbids any equitable remedy. They claim Karen "conceal[ed] from CPS and other authorities" the fact that after she adopted the children, Mary lived with her while Stephen lived with Tom, thus depriving them of sibling support and companionship. They also claim Karen "falsely represented" to the adoption agency that they were adopting the children to keep the family together when she intended to and did re-place them for adoption. Since Grandparents' alleged dealings regarding their adoptions of Stephen and Mary do not bear on the issue here—the ability of the court to amend the adoption order to include the PACA—we need not consider these contentions. (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 282–283; *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1060 [unclean hands doctrine inapplicable

30

when "the inequitable conduct did not occur in the transaction to which the relief sought relates"].) Adoptive Parents' final claim that Grandparents' hands were unclean because they "forced" them into a written agreement, "threatening to refuse to relinquish the children unless they signed," has been waived. They did not raise this particular contention in the trial court so we need not consider it. (See *id*. at p. 1059.)[6]

On remand, the trial court is to consider and decide whether, under the facts of this case, the doctrine of equitable estoppel precludes Adoptive Parents' opposition to the proposed amendment. (See *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 446 [equitable estoppel was a question of fact for trial court to address on remand where trial court had made no factual findings relevant to equitable estoppel doctrine in earlier proceeding].)

## D. Remand

In this opinion, we decide only that the trial court, as a court of equity, has the authority to use its equitable powers to amend Stephen and Mary's adoptions orders to include the parties' PACA in the interests of fairness and justice, and that evidence of fraud or an intentional or deliberate misrepresentation was not necessary for the doctrine of equitable estoppel to

---

[6]     To the extent it had been properly raised, it is unlikely the evidence would have supported a finding that Grandparents' hands were unclean. The evidence Adoptive Parents rely upon to support their assertion consists of statements in their own declarations expressing that they felt "forced to sign this 'agreement' six months into our adoption process, after two agreed-upon transition dates had been moved, after both children were in our home, after they had bonded with us and we with them, after we had told them we would be adopting them and that they would never again be separated, and after they began calling us 'mom' and 'dad.' We returned the signed agreement to [Karen] who had forwarded it to us from her attorney." There is no indication of "force" or "threat" by Grandparents.

apply to preclude Adoptive Parents' opposition to the requested amendment to the adoption orders. Having determined the court has jurisdiction to consider the adoption agency and Grandparents' motion to amend on the merits, we remand the matter for the trial court to determine whether the PACA was "executed voluntarily" and was "in the best interests of the child[ren] at the time the adoption petition [was] granted." (§ 8616.5, subd. (b).) We also remand so that the trial court may decide whether equitable estoppel applies to the facts of this case.

Because this case requires further proceedings, we address certain issues from the parties' appellate briefing to provide guidance on remand.

Throughout the hearings related to the motion to amend, the trial court contended with the grounds on which a judicial determination of voluntariness and best interests could be made. Specifically, the court surmised that such determinations would need to consider whether *at the present time* the PACA was voluntary and in the Stephen and Mary's best interests. It also recognized that present day circumstances differed greatly from 2016, when the adoption orders were entered, and that the "facts ha[d] changed" since then, noting disagreement between Adoptive Parents and Grandparents on the PACA. Grandparents took the view that the voluntariness and best interests determinations should be made based on the record in 2016 and dispute the notion that the court's determination of voluntariness and best interests had to be made based on present day circumstances.

Section 8616.5 recognizes the validity of a postadoption contact agreement "if the agreement is found by the court to have been executed voluntarily and to be in the best interests of the child *at the time the adoption petition is granted*." (§ 8616.5, subd. (b)(1), emphasis added.) The italicized

32

language signifies that voluntariness and a child's best interests must be considered from the point in time when the adoption petition was entered. In this case, that means considering voluntariness and the best interests of Stephen and Mary in 2016, when their adoption orders were entered. In light of our ruling *ante* that a trial court may exercise its equitable authority to amend an adoption order to include a postadoption contact agreement it had not seen at the time it granted an adoption petition, we must reject the view that such belated voluntariness and best interest determinations must be based on present day circumstances. The soundness of this approach is further underscored by other provisions in section 8616.5 which allow for the termination or modification of a postadoption contact agreement. Section 8616.5 subdivision (h) states such an agreement may be terminated or modified if the court finds in part that such action "is necessary to serve the best interests of the child." (§ 8616.5, subd. (h)(2)(A).) Thus, whether the terms of a PACA are presently in the children's best interests is a question for a termination or modification proceeding, not a proceeding purporting to establish whether the PACA should have been part of the adoption orders at the outset. For reasons discussed earlier, we also believe the equities favor this approach.

We note that Stephen will have turned 12 years old by the time of remand, which will raise new issues with respect to the PACA should it be approved. Under section 8616.5, subdivision (d), "The written consent to the terms and conditions of the postadoption contact agreement and any subsequent modifications of the agreement by a child who is 12 years of age or older is a necessary condition to the granting of privileges regarding visitation, contact, or sharing of information about the child, unless the court finds by a preponderance of the evidence that the agreement, as written, is in

the best interests of the child." (§ 8616.5, subd. (d).) Since the trial court's determination of voluntariness and bests interests should be based on the record in 2016, when his adoption petition was granted, such written consent would not be required in a proceeding purporting to establish whether the PACA should have been part of his adoption orders at the outset. However, for any proceeding to modify the PACA, this section 8616.5, subdivision (d) requirement must be addressed with respect to Stephen.

In light of the prospect of multiple further court proceedings to resolve the parties' current dispute and the time such proceedings entail, we would be remiss if we did not, like the trial court, urge the parties to come together and reach an agreement on the PACA for Stephen and Mary's best interests. It is evident that all parties care deeply about Stephen and Mary and all parties have graciously expressed a desire to not escalate the level of animosity. In their declarations, Adoptive Parents' stated: "We have remained open to communication between the grandparents and Mary and Stephen. . . . We hope . . . that we will eventually be able to form a better relationship with them, for the children's sake." In their declarations, Grandparents stated: "[We] always hoped that this would be a cooperative relationship and that we would be able to work as an extended family for the benefit of Stephen and Mary. Karen added, "It makes me incredibly sad that the situation has deteriorated to this extent." In addition, Grandparents appear to understand that the PACA will require modification, especially in light of the children's move across the country. In this context, efforts to reach a practical, achievable postadoption contact arrangement would be well worth undertaking.

**DISPOSITION**

The trial court's order denying the motion to amend is reversed. The matter is remanded for further proceedings consistent with this opinion.

_____
Petrou, J.


WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez, J.

*M.S. et al., v. T.S. et al./A162155*

Trial Court:        San Mateo County Superior Court

Trial Judge:        Hon. Susan Irene Etezadi

Counsel:            Law offices of Douglas R. Donnelly, Douglas Donnelly; John
                    L. Dodd & Associates and John L. Dodd for Defendants and
                    Appellants.

                    The Wald Law Group, Deborah H. Wald; Jackson & Miller,
                    Bonnie L. Miller; Strong Appellate Law and Jeanine G.
                    Strong for Plaintiffs and Respondents.