Filed 4/21/26  Lagerberg v. Lagerberg CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

|  |  |
|---|---|
| TODD MICHAEL LAGERBERG,<br><br>    Respondent,<br><br>v.<br><br>MEGAN MELINDA LAGERBERG,<br><br>    Appellant. | 2d Civ. No. B341226<br>(Super. Ct. No. D409735)<br>(Ventura County) |

Megan Lagerberg appeals from an order of the family court denying her motion to set aside a marital settlement agreement with Todd Lagerberg.  She contends Family Code[1] section 2107 required the court to set aside the agreement because the parties

---

[1] All statutory references are to the Family Code unless otherwise stated.

failed to comply with the financial disclosure requirements of sections 2103 and 2104.  We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Megan and Todd[2] married in 2007.  Megan worked as a freelance graphic designer during much of their marriage, but the couple agreed she would stop working after she gave birth to their third child in 2020.  Todd became the household's only source of income and he controlled their finances.

Megan and Todd experienced marital difficulties and entered counseling.  Megan struggled with her mental health as well.  She entered a partial hospitalization program in January of 2023 after suffering from depression and suicidal feelings.  She lived at home but spent six hours a day, six days a week receiving both group and individual therapy.  She stepped down to a five-day-per week outpatient program in February.  Megan was discharged in April of 2023.

*Marital Settlement Agreement*

Megan told Todd she wanted a divorce during her outpatient treatment.  Todd proposed they retain an attorney through his employer's prepaid legal services plan to help them with an uncontested divorce.  Megan agreed.  They executed a legal services agreement with attorney Michael Sudman in March of 2023, along with a separate conflict waiver requiring Sudman to terminate his representation if a dispute arose. Megan removed herself from their joint checking account around this time.

Megan and Todd told Sudman they had agreed how to divide their property.  Megan emailed Sudman as follows on April 10, with Todd copied:  "We agreed to a $100,000 lump sum

_____

[2] We use the parties' first names for clarity.

alimony payment. Todd needs to sell some stock and move the money into a checking account. I'm trying to get an apartment as [soon] as possible and I requested from Todd a $25,000 advance to help me pay for an apartment. Can we get a document written up that reflects that we are doing a $100,000 lump sum and that I would like a $25,000 advance payment asap to help get my own place."

Todd replied as follows to Megan and Sudman: "Yes to echo what Megan said. [¶] Our agreement is that Megan will take a lump-sum $100,000 spousal support payment that I will acquire via selling investments. She will not seek additional funds from retirement, investments, home equity, or savings. She has agreed to this so that the children won't have to lose their home or their current way of life or extracurricular activities. She also agrees to not request additional funds in the future. This 100k will be paid out in full as soon as we have signed the written agreement. I am more than willing to also provide an advance of $25,000 if needed and agreed to in writing. We have also agreed Megan will not pay any child support until she finds a full-time job next year and is gainfully employed enough to provide for herself and where it would not be a substantial financial burden."

In another email from Megan to Sudman that day, with Todd copied, she asked "How long will the process be for the alimony payment? I'm starting to look for apartments and since I'm not currently employed, the apartment complex I'm looking to rent from needs 3 months of rent in advance and proof of the alimony as income." Sudman responded, copied to Todd, "I am not aware of what you decided. It can start as soon as you guys agree that it should. [¶] If no agreement – It is no longer

uncontested. [¶] I can discuss with both of you to decide the correct amount. However, I believe you have an agreement."

Sudman agreed to draft the agreement and suggested they list their assets on a FL-142 form so he could "list and dedicate the asset to the appropriate person." He instructed them "[d]o not leave out any accounts" but said "[v]alues [were] not necessary. Only identifiers."

Todd returned the completed form by email to Sudman the next day, indicating he had shown the completed form to Megan and that "she did not have any changes." He copied Megan on the email. It identified, among other assets and liabilities: the family home in Oxnard; two cars; three savings accounts; three checking accounts; three investment accounts; Todd's 401(k); five credit cards; and miscellaneous furnishings and personal items. In an email later that same evening from Todd to Sudman, with Megan copied, Todd explained "as a follow up, all of the funds for the agreed $100,000 will be coming out of the Fidelity investment account. I will cash out stock and then give Megan the $100,000 as cash. I have agreed to take the hit of the long-term capital gains."

Sudman prepared a dissolution petition and response for Todd and Megan to file in pro per. Todd filed the petition on April 17, 2023. Several emails reflect that the parties— particularly Megan—were in a hurry to finish. Megan filed her response to the petition a week later. She moved from their house to a short-term rental around this time.

Sudman prepared a Judicial Council form entitled "Declaration Regarding Service of Declaration of Disclosure and Income and Expense Declaration" for Todd, in which he attested serving Megan with a Preliminary Declaration of Disclosure, a

4

current Income and Expense Declaration, all tax returns filed in the past two years, and "all other required information under Family Code section 2104." He signed the form on May 2, 2023. It was filed three days later.

On May 2, 2023, Megan and Todd also signed an "Agreement Regarding Preliminary Declarations of Disclosure" prepared by Sudman stating, "We the undersigned agree: [¶] 1. Each of us has disclosed to the other all pertinent financial information sufficient for both parties to analyze and determine the respective property rights and claims in this dissolution proceeding. [¶] 2. Each of us accepts the other's financial disclosures as complete and sufficient. [¶] 3. Each of us understands any Marital Settlement Agreement which may be drafted is based on the complete and truthful financial disclosures made by the other."

Todd made an initial $25,000 payment to Megan on May 12, 2023, and a second $25,000 payment on May 24. Megan enrolled in a certificate program to bring her graphic design skills up to date. She signed a lease and moved into an apartment on May 26.

Sudman prepared a draft marital settlement agreement (MSA) and judgment. Megan found two minor errors but confirmed she had no other corrections. Todd emailed questions to Sudman about child support, custody, spousal support, and property distribution. He forwarded Sudman's responses to Megan. She sent a text message to Todd around this time saying, "I hope you know that financially, you are getting a stellar deal with our alimony settlement. I am getting under compensated; it's been pointed out to me recently. [¶] $100,000 for 8-10 years of lost potential income is pretty fucking cheap." She sent him

5

another text stating: "Yeah, why the fuck did you do that when I asked for 50? I should have stay [*sic*] on you harder about it. [¶] I was trying to not be a bitch but it's backfired on me. [¶] So fucking stupid of me to trust your judgment on it. [¶] . . . [¶] I just want my fucking money and I'm sick of you and the god damn lawyer taking forever. It's bullshit. [¶] . . . [¶] I want away from you. Get me the fucking money. Where's the money from the stock? You are already getting a stellar deal in this divorce. You get to keep the house, the new car, the majority of our household possessions, you don't have to pay spousal support. I asked for a flat alimony check that I should have asked for more. [¶] So it's not I [*sic*] reasonable for me to ask for what we agreed to." In the same string of text messages, she wrote that "[n]ot everyone is as well off as you are. You make over $100,000 a year. Get me my goddamn money."

Megan and Todd signed a final, notarized version of the MSA on June 9. The signature page stated, "You should seek legal advice prior to signing this agreement." Megan emailed the signed pages to Sudman on June 11. The final MSA required Todd to pay an additional $50,000 to Megan upon entry of judgment.

*Megan Moves to Set Aside the MSA*

Sudman did not file the proposed judgment until October of 2023. He explained to Megan and Todd that his wife had recently died of cancer and that the filing had "slip[ped] through the crack." Megan responded, "Is there a way I can get the rest of my alimony ASAP?" Todd stated he would discuss the alimony timing issue with Megan at an upcoming mediation concerning

6

child custody.[3] Soon after, Sudman learned a dispute had arisen between Megan and Todd over the MSA. He said he could no longer advise them because their divorce was now contested.

Megan retained her own counsel and moved to set aside the MSA in November of 2023. She initially believed the court had already entered judgment and sought to set it aside pursuant to Code of Civil Procedure section 473 and Family Code section 2122. She later learned the court had not yet entered judgment and sought to instead rescind the MSA under Civil Code section 1689 and Family Code 2107. She described the MSA as "remarkably *one-sided* and penurious" and that she signed under duress. "The most powerful evidence of duress," she argued, "is in the agreement itself: no rational person exercising free will would ever agree to most of the provisions, as least not without some valuable consideration flowing from [Todd]." Megan stated she was homeless and desperate to escape an abusive relationship, and that Todd told her "that the only way that he would let her 'out' of their marriage was if she agreed to and signed the [MSA]." She was also afraid he would "take their children away from her and she would no longer be able to see them."

Megan asserted that Todd did not provide an income and expense declaration and had intentionally omitted the values of their assets in the MSA. She also noted they had not exchanged preliminary declarations of disclosure before signing. She argued this entitled her to rescind the MSA under the Family Code's financial disclosure provisions.

---

[3] Todd and Megan had recently petitioned for domestic violence restraining orders following a physical confrontation during a custody exchange.

7

*The Family Court Denies Megan's Request*

The family court heard Megan's request over two days in August of 2024. It received the party's filed declarations and heard testimony from Sudman, Todd and Megan. The court denied the request. Likening Sudman's role to that of a mediator, it found Megan and Todd were not required to comply with the Family Code disclosure requirements because they resolved their dispute informally. The court concluded that "[Megan] was aware of [Todd's] income and was aware that he might be getting the better end of the deal that was on the table and then signed the MSA. [The Court is] finding she didn't sign the MSA because of undue influence, duress, or coercion, but because she wanted the money right away and she wanted to be rid of her parenting obligations. So I do believe there's case law establishing that you can't just put your head in the sand and walk away and then come back and say, 'Oops, I put my head in the sand.'" The family court then entered judgment on the MSA.

DISCUSSION

*Standard of Review*

Megan does not identify the standard of review we should apply to the family court's ruling. Todd proposes, and we agree, the abuse of discretion standard is appropriate. The court promptly entered a judgment incorporating the MSA after denying the request to rescind. The order is analogous to one enforcing a settlement under Code of Civil Procedure section 664.6, or one denying a motion to set aside a judgment dividing marital property or awarding support inequitably. (§ 2120 et seq.; *In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 683-685.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial

court's ruling under review.  The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.)

*Mandatory Financial Disclosures*

Megan contends section 2107, subdivision (d) required the court to set aside the MSA because the parties did not strictly comply with the Family Code's requirement to exchange preliminary disclosure declarations prior to executing the MSA. (§§ 2107, subd. (d); 2104.)  She challenges the court's characterization of their uncontested divorce as a mediation in which they were free to relax or disregard these requirements prior to dividing their marital assets.  We disagree.

"It is the policy of the State of California . . . to achieve a division of community and quasi-community assets and liabilities on the dissolution or nullity of marriage or legal separation of the parties as provided under California law." (§ 2100, subd. (a).) "Sound public policy further favors the reduction of the adversarial nature of marital dissolution and the attendant costs by fostering full disclosure and cooperative discovery." (*Id.*, subd. (b).)  To this end, a party to a dissolution proceeding must make an "accurate and complete disclosure of all assets and liabilities in which the party has or may have an interest or obligation . . . ." (§ 2102, subd. (a)(1).)  This includes serving a preliminary declaration of disclosure with the petition for dissolution or within 60 days of filing.  "[I]f a court enters a judgment when the parties have failed to comply with all disclosure requirements of this chapter, the court shall set aside the judgment.  The failure

to comply with the disclosure requirements does not constitute harmless error."  (§ 2107, subd. (d).)

Courts have excused strict compliance with these requirements when parties choose to divide their assets and resolve other dissolution-related issues by non-judicial arbitration or mediation.  (See, e.g., *Elden v. Superior Court* (1997) 53 Cal.App.4th 1497 [non-judicial arbitration]; *In re Marriage of Woolsey* (2013) 220 Cal.App.4th 881 (*Woolsey*) [mediation].)  Here, the family court analogized the parties' uncontested divorce to *Woolsey*, finding Sudman "acted more in the role as a mediator" than a scrivener or document preparer.

Husband in *Woolsey* sought to set aside a marital settlement agreement reached during a church-sponsored mediation program because he and his wife did not comply with the financial disclosure requirements of section 2104 and 2105.  The trial court entered judgment on the agreement.  *Woolsey* affirmed after weighing the competing policies served by non-adversarial dispute resolution procedures.  It reasoned that "[p]rivate mediation, like nonjudicial arbitration, offers an alternate approach to resolve disputed issues arising from a marital dissolution.  Requiring technical compliance with disclosure rules designed for adversarial litigation would undermine the strong public policy of allowing parties to choose speedy and less costly avenues for resolving their disputes.  Parties who agree to settle their dispute by private mediation may also agree to make financial disclosures that do not meet the technical procedural requirements of sections 2104 and 2105.  Thus, strict compliance with sections 2104 and 2105 is not required for private mediations that address issues arising out of

10

a marital dissolution." (*Woolsey*, *supra*, 220 Cal.App.4th at p. 892.)

Megan distinguishes *Woolsey*, highlighting Sudman's own reluctance to label himself a "mediator" on cross-examination and arguing his services did not meet the statutory definition of mediation. (See Evid. Code, § 1115, subd. (a) ["'Mediation' means a process in which a neutral person or persons facilitate communication between the disputants to assist them in reaching a mutually acceptable agreement"].) Whether affixing the label "mediation" or "uncontested divorce" to Sudman's services, the record shows the parties engaged him to provide a speedy and less costly avenue for dividing their property and navigating the administrative landscape of dissolution. They retained him jointly and agreed he would "have a legal and ethical duty to tell the other party anything one party tells [him] in confidence." Todd proposed Sudman because his fee would be covered by his employer-sponsored legal services program. Sudman confirmed this fact. Megan testified she believed he functioned as both an attorney and a mediator while preparing the MSA.

Megan and Todd gave Sudman the contours of an agreement—a lump sum payment to Megan, a waiver of future support, a desire to keep their children's "current way of life" intact, etc. Sudman then directed them to provide the additional information needed to develop their skeletal, informal agreement into a legal document that could be incorporated into a comprehensive judgment of dissolution. He followed up with questions by group email, and, on occasion, answered their questions about child custody, support, and other matters. Emails show Todd gathered and confirmed information with Megan, then responded to Sudman with Megan copied. Todd

11

emailed Sudman on most occasions but Megan also directly communicated information and documents to Sudman, also with Todd copied. This contradicts Megan's assertion that Sudman "never facilitated any communications between [the parties], and he had no input at all as to the terms of the settlement."

Sudman's uncontested divorce services, like mediation or non-judicial arbitration, offered Megan and Todd the opportunity to dissolve their marriage with minimal expense and protracted court proceedings. The limitations of these services were stated clearly in the joint representation agreement. In addition, the parties did not wholly dispense with formal financial disclosure obligations. Sudman directed Megan and Todd to list all of their property on Judicial Council Form FL-142 (Schedule of Assets and Debts). They completed and returned the form to him. Sudman also required them to execute an "Agreement Regarding Preliminary Declarations of Disclosure" stating they each "accept[ed] the other's financial disclosures as complete and sufficient" and that "any Marital Settlement Agreement which may be drafted is based on the complete and truthful financial disclosures made by the other." Megan does not challenge the family court's factual findings that she "was aware of the parties' assets . . . and was aware of [Todd's] income and was aware that he might be getting the better end of the deal" or that Megan "didn't sign the MSA as a result of undue influence, duress, or coercion." Further, the family court identified only one omitted asset at the time of hearing—a Utah Retirement Systems account that it ordered equally divided.

Megan criticizes Sudman's role in assisting the parties, disparaging him as "We the People Minus" and complaining that he "never explained to [Megan] that this was a long term

12

marriage . . . such that [Megan] could potentially be entitled to receive permanent spousal support." But they retained him to assist with an "uncontested joint petition for divorce," and the record supports the finding that he acted primarily as a scrivener. "A single attorney acting as a scrivener should not advise the parties of the pros and cons of their agreement so that they might 'unagree.' This would defeat the very purpose for which they sought assistance." (*In re Marriage of Egedi* (2001) 88 Cal.App.4th 17, 24.)

*Megan Has Not Shown Prejudice*

Todd argues Megan has not demonstrated prejudice resulting from his failing to comply with the Family Code's formal disclosure requirements. Here we agree.

"[T]he appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) "Where any error is relied on for a reversal it is not sufficient for appellant to point to the error and rest there. . . . The fact of prejudice is just as essential as the fact of error." (*Santina v. General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 77.)

Megan contends, "If the result of this case is not a miscarriage of justice, what in the world is?" She states the MSA was "obscenely unfair" because she "[gave] up her right to receive half of the community property . . . and the right to long term, potentially lifetime, spousal support." She cites *In re Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334 in support of this contention. The family court in *Brewer* granted husband's motion to set aside a judgment and marital settlement agreement based on mistake of fact. The Court of Appeal affirmed, finding the evidence supported the finding that husband "did not have

13

accurate and complete valuations of [wife's] pension plans." (*Id.* at p. 1346.)

The family court made no such finding here. Substantial evidence supports the denial of Megan's motion to set aside. She acknowledged weeks prior to signing the MSA that Todd would receive a larger share of the community's assets. She described the draft MSA as a "stellar deal" for Todd and $100,000 as "cheap" but agreed to its terms regardless. This included waiving "any inequality [in the division of assets and debts] in the interest of reaching a full and final resolution." She does not identify what Todd concealed from her other than the dollar value of certain accounts listed on the schedule of assets and debts. He was not required to do so. (§ 2104, subd. (c)[4]; see Hogoboom and King, California Practice Guide: Family Law (The Rutter Group 2025) ¶ 11:68, p. 11-20 ["Unless the parties have stipulated to a mutual waiver of the final declarations of disclosure . . . , the preliminary declarations of disclosure are essentially only a general 'inventory' of the parties' respective assets and liabilities. Unlike the final disclosure declarations,

---

[4] Section 2104, subd. (c) states: "The preliminary declaration of disclosure shall set forth with sufficient particularity, that a person of reasonable and ordinary intelligence can ascertain, all of the following: [¶] (1) The identity of all assets in which the declarant has or may have an interest and all liabilities for which the declarant is or may be liable, regardless of the characterization of the asset or liability as community, quasi-community, or separate. [¶] (2) The declarant's percentage of ownership in each asset and percentage of obligation for each liability when property is not solely owned by one or both of the parties. The preliminary declaration may also set forth the declarant's characterization of each asset or liability."

characterization and valuation details are not required"] italics omitted.)  The family court divided the only asset not listed in the MSA, i.e., Todd's Utah Retirement System account, evenly between them.

Megan reads section 2107, subdivision (d) as requiring the court to automatically rescind an agreement or set aside a judgment if a party fails to comply with the Family Code's financial disclosure requirements.  This interpretation conflicts with section 2121, subdivision (b)'s mandate that a party moving to set aside a judgment show that the error "materially affected the original outcome" of the case.  (See *Dustin v. Superior Court* (2002) 99 Cal.App.4th 1311, 1320 [statutory schemes must be read as a whole, harmonizing their provisions].)  Her interpretation also conflicts with Article VI, section 13, of the California Constitution, which prohibits setting aside a judgment based on procedural error absent a showing "the error complained of has resulted in a miscarriage of justice."  This mandate "trumps any conflicting provision of the Family Code. . . . [¶]  To the degree, then, that section 2107, subdivision (d) is read for the proposition that a judgment must be set aside or a new trial granted solely because of a failure to exchange . . . declarations of disclosure, it is not consistent with our state's Constitution." (*In re Marriage of Steiner & Hosseini* (2004) 117 Cal.App.4th 519, 527; see *In re Marriage of Heggie* (2002) 99 Cal.App.4th 28, 29-30 ["if a set-aside motion is supported only by an imbalance in the division of community property, the trial court *cannot* grant the motion"].)

## DISPOSITION

The order denying Megan's motion to set aside the MSA and the judgment entered thereon is affirmed. Respondent shall recover his costs on appeal.

NOT TO BE PUBLISHED.

CODY, J.

We concur:

YEGAN, Acting P. J.

VAN ROOYEN, J.*

---

\* Judge of the Superior Court for San Luis Obispo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Michele M. Castillo, Judge
Superior Court County of Ventura
_____


Ventura County Legal Services, Christina Vanarelli for Appellant.

Todd Michael Lagerberg, in pro per.; Norman Dowler and Thomas J. Hutchinson for Respondent. [*Retained.*]